STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Robert E. POST,
Defendant-Appellant

Supreme Court

*No. 2005AP2778–CR. Oral argument February 14, 2007.
—Decided May 23, 2007.*

2007 WI 60

(Also reported in 733 N.W.2d 634.)

1

For the plaintiff-respondent-petitioner the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-appellant there was a brief filed by *T. Christopher Kelly,* and *Kelly & Habermehl, S.C.,* Madison, and there was oral argument by *T. Christopher Kelly.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of an unpublished court of appeals decision reversing a judgment convicting Robert Post of operating a motor vehicle with a prohibited alcohol concentration, as a fifth offense.[1] The State asserts that the court of appeals erred in concluding that Post's deviations within one lane of travel, with nothing more, failed to provide the police officer with the reasonable suspicion to justify an investigative stop of the vehicle. The State, in essence, asks for a bright-line rule that repeated weaving within a single lane provides the reasonable suspicion necessary to justify a traffic stop.

¶ 2. We determine that weaving within a single traffic lane does not alone give rise to the reasonable suspicion necessary to conduct an investigative stop of

---

[1] *See State v. Post,* No. 2005AP2778–CR, unpublished slip op., (Wis. Ct. App. Aug. 10, 2006) (reversing judgment of circuit court for Sauk County, Patrick Taggart, Judge).

a vehicle. However, we also determine that under the totality of the circumstances, the police officer did have reasonable suspicion in this case, and that the stop did not violate Post's constitutional right to be free from unreasonable searches and seizures. Accordingly, we reverse the court of appeals.

I

¶ 3. In February 2004, Sauk Prairie police sergeant Josh Sherman, who had six years of experience as a police officer, was on routine patrol on Water Street in Sauk City. The northbound side of Water Street is approximately 22–24 feet wide from the yellow center line to the curb. It contains a traffic lane and parking lane. There is no line or marking delineating the traffic lane from the parking lane. The parking lane is bounded by the curb.

¶ 4. Sergeant Sherman testified that at approximately 9:30 p.m., he was traveling southbound on Water Street and observed two cars traveling northbound. The second vehicle, a Chevrolet Cavalier driven by Post, was "canted" such that it was driving at least partially in the unmarked parking lane.

¶ 5. After the two cars passed, Sherman turned around to follow them. He did not lose sight of the cars and caught up to them after six or seven blocks. While following the cars, Sherman observed Post's car traveling in a smooth "S-type" pattern. Sherman described the movement as "a smooth motion toward the right part of the parking lane and back toward the center line." He stated that Post's car moved approximately ten feet from right to left within the northbound lane, coming within 12 inches of the center line and to within six to eight feet of the curb. Post's car repeated the

5

S-pattern several times over two blocks. The movement was neither erratic nor jerky, and the car did not come close to hitting any other vehicles or to hitting the curb at the edge of the parking lane. Sherman testified that the manner of Post's driving was a "clue that he may be intoxicated."

¶ 6. After being followed by Sherman for two blocks, both cars signaled and made a left turn onto a cross street. The first car turned into the oncoming traffic lane. The second car, driven by Post, made a proper turn. Sherman activated his emergency lights and both cars pulled over.

¶ 7. Relying on this court's decision in *State v. Waldner*, 206 Wis. 2d 51, 556 N.W.2d 681 (1996), the circuit court determined that Sherman's testimony of "unusual driving" and "drifting even within one's own lane" provided the reasonable suspicion necessary to justify a traffic stop. The court of appeals reversed, concluding that slight deviations within a single travel lane do not give rise to a reasonable suspicion that a driver is intoxicated.

II

¶ 8. In this case we examine whether a traffic stop violated Post's constitutional rights because it was not based on reasonable suspicion. The question of whether a traffic stop is reasonable is a question of constitutional fact. *State v. Knapp*, 2005 WI 127, ¶ 19, 285 Wis. 2d 86, 700 N.W.2d 899. A question of constitutional fact is a mixed question of law and fact to which we apply a two-step standard of review. *State v. Martwick*, 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552. We review the circuit court's findings of historical fact

under the clearly erroneous standard, and we review independently the application of those facts to constitutional principles. *Id.; State v. Payano-Roman,* 2006 WI 47, ¶ 16, 290 Wis. 2d 380, 714 N.W.2d 548.

## III

¶ 9. This court has never addressed the question of whether a vehicle's weaving within a single lane, without more, provides the reasonable suspicion necessary to justify an investigatory stop of that vehicle. We begin our analysis of this question by reviewing the principles underlying investigatory stops.

¶ 10. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."[2] In *Terry v. Ohio,* the U.S. Supreme Court allowed that,

---

[2] The State frames this question in terms of both the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution, which states: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause . . . ." This court has in large part interpreted the protections against unreasonable searches and seizures afforded by the state and federal constitutions coextensively. *See State v. Knapp,* 2005 WI 127, ¶ 59, 285 Wis. 2d 86, 700 N.W.2d 899; *State v. Williams,* 2001 WI 21, ¶ 18, 241 Wis. 2d 631, 623 N.W.2d 106. However, the state provisions may provide greater protections. *State v. Eason,* 2001 WI 98, ¶ 63, n.30, n.31, 245 Wis. 2d 206, 629 N.W.2d 625; *see also Michigan v. Long,* 463 U.S. 1032, 1041 (1983)("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").

although investigative stops are seizures within the meaning of the Fourth Amendment, in some circumstances police officers may conduct such stops even where there is no probable cause to make an arrest. 392 U.S. 1, 22 (1968). Such a stop must be based on more than an officer's "inchoate and unparticularized suspicion or 'hunch.' " *Id.* at 27. Rather, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion of the stop. *Id.* at 21.

¶ 11. This court adopted the *Terry* standard for investigative stops in *State v. Chambers.* 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972). The Wisconsin legislature codified the standard in Wis. Stat. § 968.24 (2005–06).[3] In interpreting § 968.24 we apply *Terry* and cases following *Terry. State v. Williamson,* 113 Wis. 2d 389, 399–400, 335 N.W.2d 814 (1983).

¶ 12. Investigative traffic stops are subject to the constitutional reasonableness requirement. *Whren v. United States,* 517 U.S. 806, 809–10 (1996); *State v. Rutzinski,* 2001 WI 22, ¶ 14, 241 Wis. 2d 729, 623

---

[3] Wis. Stat. § 968.24 provides:

Temporary questioning without arrest. After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such a person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity of where the person was stopped.

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

N.W.2d 516. The burden of establishing that an investigative stop is reasonable falls on the state. *State v. Taylor,* 60 Wis. 2d 506, 519, 210 N.W.2d 873 (1973).

¶ 13. The determination of reasonableness is a common sense test. The crucial question is whether the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime. *State v. Anderson,* 155 Wis. 2d 77, 83–84, 454 N.W.2d 763 (1990). This common sense approach balances the interests of the State in detecting, preventing, and investigating crime and the rights of individuals to be free from unreasonable intrusions. *Waldner,* 206 Wis. 2d at 56; *Rutzinski,* 241 Wis. 2d 729, ¶ 15; *State v. Guzy,* 139 Wis. 2d 663, 679, 407 N.W.2d 548 (1987). The reasonableness of a stop is determined based on the totality of the facts and circumstances. *State v. Williams,* 2001 WI 21, ¶ 22, 241 Wis. 2d 631, 623 N.W.2d 106; *Guzy,* 139 Wis. 2d at 679.

¶ 14. The State contends that Sergeant Sherman had reasonable suspicion to stop Post. It advocates the view that repeated weaving of a motor vehicle within a single lane (absent an obvious innocent explanation) provides the reasonable suspicion to make an investigatory stop. While we agree that the facts of the case give rise to a reasonable suspicion that Post was driving while intoxicated and that the investigative stop was reasonable, we reject the bright-line rule that repeated weaving within a single lane alone gives rise to reasonable suspicion. Rather, our determination is based on the totality of the circumstances, in accord with Wisconsin jurisprudence.

¶ 15. In *Waldner,* this court addressed the issue of investigative stops based on reasonable suspicion that a

person is driving while intoxicated. There, a police officer observed the defendant's car traveling at a slow speed. The car stopped at an intersection that had no stop sign or traffic light, turned onto a cross-street, and accelerated "at a high rate of speed" (though not exceeding the speed limit). 206 Wis. 2d at 53. The officer then observed the car pull into a legal parking space, where the defendant opened the car door and poured what appeared to be "a mixture of liquid and ice" from a plastic glass onto the roadway. *Id.* When the officer pulled near the defendant and identified himself, the defendant began to walk away, at which point the officer made an investigative stop of the defendant. *Id.* at 53–54.

¶ 16. The defendant in *Waldner* argued that the stop was unreasonable on the ground that it was based upon the officer's inchoate hunch, and not on a reasonable suspicion. This court determined that the search was based on a reasonable suspicion. It noted that the stop was based on a number of specific, articulable facts, including the car's varying speeds and stopping at an intersection without a stoplight or sign, and the driver's pouring out a cup of liquid and ice. The court recognized that each of these facts alone would be insufficient to provide reasonable suspicion. However, it explained that cumulatively they were sufficient to support an inference that the driver was intoxicated:

> Any one of these facts, standing alone, might well be insufficient. But that is not the test we apply. We look to the totality of the facts taken together. The building blocks of fact accumulate. And as they accumulate, reasonable inferences about the cumulative effect can be drawn. In essence, a point is reached where the sum of the whole is greater than the sum of its individual parts. That is what we have here.

*Id.* at 58.

10

¶ 17. Thus, the court's determination was based on the totality of circumstances rather than on any particular fact. Considered as a whole they constituted reasonable suspicion. *Id.* at 60–61.

¶ 18. The State's view that repeated weaving within a single lane alone gives an experienced police officer reasonable suspicion to make an investigatory stop therefore conflicts with the approach articulated in *Waldner.* The State asks for a bright-line rule, where this court has consistently maintained that the determination of reasonable suspicion is based upon the totality of the circumstances. *State v. Kyles,* 2004 WI 15, ¶ 49, 269 Wis. 2d 1, 675 N.W.2d 449; *Williams,* 241 Wis. 2d 631, ¶ 22; *State v. Richardson,* 156 Wis. 2d 128, 139–40, 456 N.W.2d 830 (1990); *Guzy,* 139 Wis. 2d at 679; *see also Alabama v. White,* 496 U.S. 325, 330 (1990)(adopting a totality of circumstances test for determining reasonable suspicion based on anonymous tips).

¶ 19. Further, the State's proffered bright-line rule is problematic because movements that may be characterized as "repeated weaving within a single lane" may, under the totality of the circumstances, fail to give rise to reasonable suspicion. This may be the case, for example, where the "weaving" is minimal or happens very few times over a great distance.[4] Courts in a number of other jurisdictions have concluded that weaving within a single lane can be insignificant

---

[4] This is, in effect, the rule articulated by the court of appeals. *Post,* unpublished slip op., ¶ 4. As we note below, however, the conclusion that Post's deviations were "slight" is not in accord with the circuit court's rendition of the facts.

enough that it does not give rise to reasonable suspicion.[5] In such cases, weaving within a single lane would not alone warrant a reasonable police officer to suspect that the individual has committed, was committing, or is about to commit a crime.

¶ 20. In addition, the rule that weaving within a single lane may alone give rise to reasonable suspicion fails to strike the appropriate balance between the State's interest in detecting, preventing, and investigating crime with the individual's interest in being free from unreasonable intrusions. "[R]epeated weaving within a single lane" is a malleable enough standard that it can be interpreted to cover much innocent conduct. In *U.S. v. Lyons,* a police officer made an investigatory stop after having seen the defendant's vehicle weave three to four times within a single lane. 7 F.3d 973, 974 (10th Cir. 1993). The court recognized "the universality of drivers' 'weaving' in their lanes." *Id.* at 976. It therefore cautioned that allowing weaving to justify a vehicle stop may subject many innocent people to an investigation. "Indeed, if failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *Id.; United States v. Colin,* 314 F.3d 439, 446 (9th Cir. 2002).

---

[5] *Warrick v. Comm'r of Pub. Safety,* 374 N.W.2d 585, 585–86 (Minn. Ct. App. 1985)("subtle" weaving within lane insufficient to support reasonable suspicion); *Salter v. North Dakota Dept. of Transp.,* 505 N.W.2d 111, 112–113 (N.D. 1993)(weaving described as "slight movement back and forth" insufficient to support reasonable suspicion); *State v. Binette,* 33 S.W.3d 215, 220 (Tenn. 2000)(multiple lateral movements which were "not pronounced" insufficient to support reasonable suspicion).

¶ 21. Because the standard proffered by the State can be interpreted to cover conduct that many innocent drivers commit, it may subject a substantial portion of the public to invasions of their privacy. It is in effect no standard at all. Adopting it here would allow essentially unfettered discretion and permit the arbitrary invasions of privacy by government officials addressed by the Fourth Amendment and Article I, Section 11. *Delaware v. Prouse,* 440 U.S. 648, 661 (1979); *Brown v. Texas,* 443 U.S. 47, 52 (1979); *State v. Sykes,* 2005 WI 48, ¶ 13, 279 Wis. 2d 742, 695 N.W.2d 277; *Waldner,* 206 Wis. 2d at 57; *Guzy,* 139 Wis. 2d at 672.[6]

---

[6] The State contends that "the individual privacy interest implicated in a traffic stop for possible drunk driving pales by comparison" to the interest in preventing drunk driving, citing the case of *Michigan Dept. of State Police v. Sitz.* 496 U.S. 444, 451–55 (1990). *Sitz* is inapt in this context. That case involved vehicle stops at sobriety check-points where every passing car was briefly detained while the drivers were checked for signs of intoxication. *Id.* at 447. Because every car was stopped, there was no individualized suspicion. However, the officers in *Sitz* were not in the position of exercising discretion in determining which vehicles they detained for initial examination. This contrasts with situations like the one in the present case, where patrol officers must exercise discretion.

We are also skeptical of the State's interpretation of the Supreme Court's assessment of the magnitude of investigatory stops for drunk driving. Relying on *Sitz,* the State asserts that an investigatory traffic stop "is a minimal intrusion on individual privacy." The State compares the intrusion of the stop in the present case to the magnitude of the check-point stops in *Sitz.* However, the *Sitz* court determined that the intrusions of check-point stops were minimal *in contrast to* roving patrol type stops of the sort at issue here. 496 U.S. at 453. The State's claim that *Sitz* supports the view that roving patrol stops are minimally intrusive appears to turn that case on its head.

¶ 22. Like the State, Post offers a bright-line rule for determining reasonable suspicion. He argues that movements within a lane can give rise to the reasonable suspicion necessary to justify an investigative stop only where the movements are erratic, unsafe, or illegal.[7] We reject this bright-line rule as well.

¶ 23. Post's claim that lateral movements must be erratic, unsafe, or illegal in order to generate reasonable suspicion is belied by our decision in *Waldner*. In that case, the defendant drove slowly, paused at an intersection without a stoplight or sign, accelerated quickly, and poured liquid and ice from a cup. 206 Wis. 2d at 53. The *Waldner* court based its conclusion that there was reasonable suspicion on the totality of the circumstances, not on an intermediate determination that the defendant's driving was erratic or unsafe. Moreover, even if one were to interpret the driving in *Waldner* as erratic or unsafe, there is no reason to conclude that those actions were any more erratic or unsafe than Post's weaving in the present case.

¶ 24. Further, it is clear that driving need not be illegal in order to give rise to reasonable suspicion. As the *Waldner* court observed, requiring reasonable suspicion to be based upon an observation of unlawful

[7] Post also contends that his vehicle's movement was "drifting" rather than "weaving," and that "weaving" is characterized by being erratic. Because his vehicle's "drifting" was neither erratic nor unsafe, he argues that it cannot give rise to reasonable suspicion. We do not see anything to be gained by distinguishing or parsing "weaving" from "drifting." What matters here is whether the vehicle's movements, considered with the totality of the circumstances, give rise to a reasonable suspicion that Post was driving while intoxicated.

conduct would allow investigatory stops only when there was probable cause to make an arrest. *Id.* at 59. Such a requirement would run counter to the law set forth in *Terry,* where an officer's investigative stop was based on activity that standing alone fell short of the probable cause necessary to make an arrest. *Waldner,* 206 Wis. 2d at 59 (citing *State v. Jackson,* 147 Wis. 2d 824, 835, 434 N.W.2d 386 (1989)); *see Terry,* 392 U.S. at 22–23. We therefore determine that a driver's actions need not be erratic, unsafe, or illegal to give rise to reasonable suspicion.

¶ 25. Cases from other jurisdictions support our view that reasonable suspicion does not require erratic, unsafe, or illegal driving, as Post maintains. They also support our view that reasonable suspicion does not follow automatically from repeated weaving within a single lane, as the State advocates. Certainly courts in other jurisdictions have found reasonable suspicion where vehicles weave erratically.[8] However, courts also point to other factors, such as pronounced or prolonged weaving[9] or other suspicious aspects of

---

[8] *People v. Greco,* 783 N.E.2d 201, 206 (Ill. App. Ct. 2003); *State v. Dorendorf,* 359 N.W.2d 115, 117 (N.D. 1984)("erratic" weaving sufficient to justify investigative stop); *Neal v. Commonwealth,* 498 S.E.2d 422, 423 (Va. Ct. App. 1998)("erratic driving" sufficient to justify investigative stop).

[9] *People v. Perez,* 221 Cal. Rptr. 776, 776 (Cal. App. Dep't Super. Ct. 1977)("pronounced weaving" over three-quarters of a mile sufficient for reasonable suspicion); *Roberts v. State,* 732 So.2d 1127, 1128 (Fla. Dist. Ct. App. 1999)("significant" side-to-side weaving sufficient for reasonable suspicion); *State v. Thomte,* 413 N.W.2d 916, 917 (Neb. 1987)("sharp" weave followed by another weave sufficient for reasonable suspicion); *State v. Bailey,* 624 P.2d 663, 664 (Or. Ct. App. 1981)(continuous weaving that took place over "substantial distance" sufficient to justify investigative stop).

15

driving,[10] as supporting a finding of reasonable suspicion.

¶ 26. Thus, we adopt neither the bright-line rule proffered by the State that weaving within a single lane may alone give rise to reasonable suspicion, nor the bright-line rule advocated by Post that weaving within a single lane must be erratic, unsafe, or illegal to give rise to reasonable suspicion. Rather, we maintain the well-established principle that reviewing courts must determine whether there was reasonable suspicion for an investigative stop based on the totality of the circumstances.

¶ 27. Having concluded that the determination of whether weaving within a single lane gives rise to reasonable suspicion requires an examination of the totality of the circumstances, we turn to the particular facts of this case. The question we must answer is whether the State has shown that there were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion of the stop. *Terry,* 392 U.S. at 21. While we acknowledge that this case presents a close call, we determine that the movements do warrant the stop.

¶ 28. As in *Waldner,* the police officer in the present case did not observe any actions that constituted traffic violations or which, considered in isolation,

---

[10] *United States v. Banks,* 971 F. Supp. 992, 993 (E.D. Va. 1997)(weaving combined with driving 5–7 miles per hour under the speed limit and slower than other cars on the road sufficient for reasonable suspicion); *Veal v. State,* 614 S.E.2d 143, 145 (Ga. Ct. App. 2005)(weaving combined with driving 25 miles per hour in a 55–mile-per-hour zone sufficient for reasonable suspicion); *State v. Jones,* 386 S.E.2d 217, 219 (N.C. Ct. App. 1989)(weaving combined with driving 45 miles per hour in a 65–mile-per-hour zone sufficient for reasonable suspicion).

provided reasonable suspicion that criminal activity was afoot. However, when considered in conjunction with all of the facts and circumstances of the case, Post's driving provided Sherman with reasonable suspicion to believe that Post was driving while intoxicated.

¶ 29. The court of appeals concluded that Post's movements amount to "slight deviations within one lane of travel" and therefore are not sufficient for reasonable suspicion. However, the court of appeals' account is not in accord with the circuit court's rendition. Although the circuit court did not detail the measurements upon which it relied, it does state that Post's vehicle appeared to be "moving between the roadway centerline and parking lane." Moving between the roadway centerline and parking lane is not slight deviation within one's own lane. The circuit court also incorporated by reference Sherman's testimony regarding Post's "drifting and unusual driving." Our read of Sherman's testimony does not support the view that Post's weaving constituted only slight deviation within one lane.

¶ 30. When Sergeant Sherman first observed the two vehicles, he described Post's vehicle as being "canted" into the parking lane. He explained that this meant that Post "[w]asn't traveling in the designated traveling lane." After this initial observation, Sherman turned around to follow the vehicles. He testified that this was when he observed Post's weaving.

> Q: [W]ith respect to [Post's vehicle], what did you observe concerning the driving conduct?
>
> A: The vehicle continued to travel northbound, traveling in an S type manner, from the parking lane to the yellow center line.
>
> Q: You say an S type manner. What do you mean?

A: The motion that the vehicle was making wasn't jerky. It was a smooth motion toward the right part of the parking lane and back towards the center line.

Q: Using the driver's side front door tire as your point of reference, how far did the vehicle go from right to left within that lane?

A: Approximately ten feet.

Q: How many times did it do that?

A: I don't have a specific number of times. Approximately two blocks worth.

¶ 31. Sergeant Sherman testified that driving in such an S-type manner contrasted with most driving behavior:

Q: Did that strike you as being unusual driving conduct?

A: Yes.

Q: Why was that?

A: Most vehicles travel straight down the road near the center line.

Q: Was the first car . . . also traveling in that same manner?

A: Not at that time, no.

¶ 32. Further, Sherman described Post's S-type driving as covering both the traveling lane and the parking lane:

Q: Do you know approximately how wide the lane is on Water Street?

A: I would say 22 to 24 feet.

Q: How close did the vehicle come to the center line?

A: At times, within 12 inches.

. . . .

Q: How close did the vehicle come to the curb on the right side?

A: Within approximately 6 to 8 feet.

¶ 33. After initially stating that he did not have an estimate of how many times Post's vehicle weaved, on cross-examination Sherman stated that Post's vehicle weaved "several" or "a few" times:

Q: [You] [d]on't have any estimate at all?

A: Several times within the two blocks.

Q: Could it be a few times?

A: I'm sorry?

Q: Could it be a few times?

A: Again, our words could be the same, a few and several.

¶ 34. Post contends that his car "didn't change its position very much at all." He bases this claim on a selective reading of Sergeant Sherman's testimony at the suppression hearing. Sherman testified that the northbound side of Water Street was "22 to 24" feet wide, that Post's vehicle came within one foot of the center line, and to within "approximately six to eight feet" of the curb, and that Post's vehicle was about eight feet wide. Post picks out only the favorable parts of Sherman's estimates. For example, he asserts that northbound Water Street is 22 feet wide (i.e., the low

19

end of Sherman's estimate) and that his vehicle "was never closer to the curb than eight feet" (i.e., the high end of Sherman's estimate). Thus, subtracting the width of the car (which Sherman testified he was estimating at "[p]robably eight feet" wide),[11] the distance from the center line, and the distance from the curb, Post calculates that his car weaved only five feet from side-to-side.

¶ 35. However, Post's calculations fail to account for the whole of Sergeant Sherman's testimony. Sherman estimated northbound Water Street to be 22 to 24 feet wide and that Post's vehicle came to within six to eight feet of the curb. Thus, even taking his estimate that the vehicle was eight feet wide at face value, Sherman's testimony indicates that Post's weave was between five feet and nine feet, based on his individual estimates of distances. Sherman further testified that Post's vehicle moved laterally ten feet.

¶ 36. However, the width of Post's weaving is not the only specific, articulable fact in the case. It is noteworthy that the single lane here, described as between 22 and 24 feet, is approximately twice as wide as the standard single lane.[12] Post's vehicle moved in a

---

[11] At oral argument, Post's counsel was questioned about the accuracy of the estimate the Chevy Cavalier was "[p]robably eight feet" wide. We note that this appears to greatly overestimate the width of Post's car. When Sherman was questioned at the suppression hearing regarding his estimate, he repeatedly noted that this estimate was "approximate." Nevertheless, this estimate of "probably eight feet" is the only description of the width of the Cavalier that is reflected in the record.

[12] As a point of reference, the Wisconsin Department of Transportation's *Facilities Development Manual* describes the desirable lane width for urban roadways as 10 to 12 feet, depending on volume. Chapter 11, Section 20, Subject 1, Figure

discernible S-type pattern within that single lane, and it repeated that S-type pattern several (or "a few") times for two blocks. When Sherman first observed Post's vehicle, it was "canted into the parking lane" and "wasn't in the designated traffic lane." Finally, we note that the incident took place at 9:30 at night. While this is not as significant as when poor driving takes place at or around "bar time," it does lend some further credence to Sherman's suspicion that Post was driving while intoxicated.[13]

¶ 37. When viewed in isolation, the individual facts that Post was weaving across the travel and parking lanes, that the weaving created a discernible

1, available at https://trust.dot.state.wi.us/static/standards/ fdm/11/11–20–1.pdf (updated April 26, 2007). Similarly, the minimum design standards for county trunk highways call for 10– to 12–foot lanes. Wis. Admin. Code § Trans. 205.03(2)(2006). The minimum design standards for improvements to existing town roads call for 9– to 12–foot lanes. Wis. Admin. Code § Trans. 204.03(1)(2006). *See* Wis. Stat. § 902.03(1)(b).

[13] Relying on this court's decision in *State v. Seibel*, 163 Wis. 2d 164, 471 N.W.2d 226 (1991), the State contends that because Post appeared to be traveling in tandem with the car in front of him, the fact that the front car made a turn into the wrong traffic lane supports the inference that Post was driving while intoxicated. This argument is not compelling. In *Seibel*, it was undisputed that the motorcycle driver was traveling with companions from whom the strong odor of intoxicants emanated. *Id.* at 181. Here, it is not established that the cars were traveling in tandem, and the evidence that the driver of the first car was intoxicated is scant. Moreover, as the court noted in *Seibel*, "ordinarily, the mere fact that the defendant's friends were drinking would not constitute evidence of the defendant's drinking." *Id.* at 182. Finally, we are wary of a rule that would allow the actions of one car to justify investigative stops of other cars because of their proximity to the first car.

S-type pattern, that Post's vehicle was canted into the parking lane, and that the incident took place at night may not be sufficient to warrant a reasonable officer to suspect that Post was driving while intoxicated. As this court stated in *Waldner,* "[a]ny one of these facts, standing alone, might well be insufficient." 206 Wis. 2d at 58. However, such facts accumulate, and "as they accumulate, reasonable inferences about the cumulative effect can be drawn." *Id.* We determine, under the totality of the circumstances, that Sherman presented specific and articulable facts, which taken together with rational inferences from those facts, give rise to the reasonable suspicion necessary for an investigative stop. Accordingly, the stop did not violate Post's constitutional right to be free from unreasonable searches and seizures.

## IV

¶ 38. In sum, we determine that weaving within a single traffic lane does not alone give rise to the reasonable suspicion necessary to conduct an investigative stop of a vehicle. However, we also determine that under the totality of the circumstances, the police officer did have reasonable suspicion in this case, and that the stop did not violate Post's constitutional right to be free from unreasonable searches and seizures. Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 39. SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part and dissenting in part*). The State presented the following issue of law for this court to decide: Does the drifting or weaving of a motor vehicle within a

single traffic lane several (or a few) times over two blocks give an experienced patrol officer reasonable suspicion to make an investigatory stop for possible drunk driving? The State seeks an affirmative answer and a per se rule that repeated drifting or weaving within a single lane alone, absent any obvious innocent explanation for the drifting or weaving, justifies a traffic stop. The majority opinion answers with a resounding "no."

## I

¶ 40. I agree with the majority opinion that the court should not adopt a bright-line rule declaring that the drifting or weaving of a vehicle within a single lane alone gives rise to the reasonable suspicion necessary for a law enforcement officer to conduct an investigative stop of that vehicle. Majority op., ¶ 2.[1] I agree with the majority that adopting the State's standard would "allow essentially unfettered discretion and permit the arbitrary invasions of privacy by government officials addressed by the Fourth Amendment and Article I, Section 11." Majority op., ¶ 21.

¶ 41. I also agree with the majority opinion that the constitutionality of the stop of Robert Post's vehicle must be judged under the totality of the circumstances test. In short, the "determination [of reasonable suspicion] is based on the totality of the circumstances, in accordance with Wisconsin jurisprudence." Majority op., ¶ 14.

---

[1] Thus the majority and I agree with the court of appeals that the movement of a car in a single lane, without more, does not give a law enforcement officer reasonable suspicion that the driver was violating a law that would justify a traffic stop. The court of appeals reversed the judgment and remanded the cause for further proceedings.

¶ 42. This case is not just about Robert Post. This is an important case because the rule of law announced by the court today applies with equal force to all who drive. "Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed."[2]

¶ 43. A traffic stop is a "major interference in the lives of the [vehicle's] occupants." *Coolidge v. New Hampshire,* 403 U.S. 443, 479 (1971). Significant interests are at stake when determining the permissibility of a traffic stop. An invasion of privacy occurs every time a law enforcement officer stops a car, regardless of the motivation for the stop. "The Fourth and Fourteenth Amendments are implicated . . . because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."[3] Traffic stops "interfere with freedom of movement, are inconvenient, and consume time," and they "may create substantial anxiety" for those detained.[4] Moreover, a traffic stop provides law enforcement officers with an opportunity for further intrusion on the driver and passengers.

## II

¶ 44. I disagree with the majority opinion's application of the totality of circumstances standard in the instant case.

¶ 45. The standard by which this court reviews a circuit court or court of appeals decision on the consti-

---

[2] *Delaware v. Prouse,* 440 U.S. 648, 662–63 (1979).

[3] *Id.* at 653.

[4] *Id.* at 657.

24

tutionality of a stop is well established. A reviewing court accepts the circuit court's findings of historical fact unless they are clearly erroneous, but determines the application of constitutional principles to those facts independently of the circuit court and court of appeals, but benefiting from their analyses. Majority op., ¶ 8.

¶ 46. The majority opinion is not faithful to this standard of review: The majority opinion engages in its own fact-finding and ignores relevant facts in setting forth the totality of the circumstances in the instant case.

¶ 47. The circuit court made no findings of fact; it issued a brief memorandum decision describing some facts. The memorandum decision describes Post's car as appearing to be "canted"[5] or moving between the roadway centerline and the parking lane, drifting with no sudden, jerky, or violent movement.

¶ 48. The circuit court did not apply the totality of circumstances test. Rather, the circuit court decided in its memorandum decision, as a matter of law, that "based on the training and experience of Officer Sherman, drifting even within one's own lane gives a suspicion that the driver may have been intoxicated."

¶ 49. The majority opinion mines the testimony of the law enforcement officer, who was the only witness to testify, when exploring the totality of the circumstances. The officer, at various times in his testimony, characterized Post's car as having "drifted," "canted," and traveled in an "S type manner" in a "smooth

---

[5] When asked at the suppression hearing, "What do you mean by that [word "cant"]?", the officer explained he meant that Post's vehicle "[w]asn't traveling in the designated traveling lane, traveling closer into the parking lane."

25

motion" from the unmarked parking lane to a foot from the center lane dividing the two lanes of traffic. The officer testified that Post's car "did not drift more than 5 feet." The officer also testified that the width of Post's vehicle was eight feet and further estimated that the single traffic lane, which included unmarked space for parking, was approximately 22–24 feet wide.

¶ 50. The majority opinion questions the accuracy of the officer's estimate of the width of Post's vehicle as eight feet but nonetheless accepts it and the other estimates provided by the officer as valid measurements. Majority op., ¶ 34 n.11. The majority opinion then goes outside the record to show that the officer's estimate of the width of the parking and driving area makes the width of the parking and driving area twice as wide as a "standard" single lane. Majority op., ¶ 36.

¶ 51. The majority opinion then performs its own calculations of the "S" pattern on the basis of the officer's testimony of the dimensions of the roadway and car, and finds that Post's weaving was "between five feet and nine feet." Majority op., ¶ 35. The officer never made this calculation.

¶ 52. Even more problematic, the majority opinion appears to treat what the officer described as Post's car "canting" in the parking lane as a separate factor from Post's car weaving and making a S-shaped maneuver. According to the majority opinion, under the totality of the circumstances, we are presented not only with a vehicle in a wide single lane drifting, but also a vehicle traveling in an S-type pattern and "canting" into the parking area.[6] The record is clear, however, that the officer was describing Post's driving in three different

[6] Majority op., ¶ 37.

ways. The officer was not testifying that Post's car performed three different maneuvers.

¶ 53. The majority opinion is correct that nothing is to be gained from parsing "weaving" from "drifting."[7] I would add that nothing is to be gained from parsing "drifting," "weaving" "canting," and an "S-shaped movement" in the present case. The issue here is whether "the vehicle's movements, considered with the totality of the circumstances, give rise to a reasonable suspicion that Post was driving while intoxicated."[8]

¶ 54. So what is the totality of circumstances upon which the majority relies? Here are the circumstances: The officer estimated the single lane as approximately 22–24 feet wide because it also included an unmarked parking lane (in which no cars were parked and in which Post could lawfully drive); Post's car, according to the officer's testimony, drifted no more than 5 feet within this wide single lane (although the majority opinion calculates the drift could have been up to 9 feet); and it was 9:30 p.m.

¶ 55. The majority opinion concedes that 9:30 p.m. is not as significant as bar closing time, but still concludes that "it does lend some further credence to [the officer's] suspicion that Post was driving while intoxicated." Majority op., ¶ 36. Not surprisingly, the majority opinion is unable to explain how or why driving at 9:30 p.m. (in contrast to any other time) lends any credence to the suspicion of drunk driving.

¶ 56. In contrast, the majority opinion ignores, without explanation, other salient factors in examining the totality of the circumstances: Post maintained the legal speed limit. There was no indication that Post was

---

[7] Majority op., ¶ 22 n.7.

[8] *Id.*

traveling at an unsafe or unusual speed or was traveling either too fast or too slow for conditions. Post never came close to striking another vehicle. Post properly signaled before making a left turn at an intersection. Post successfully navigated a left-hand turn even though the car immediately in front of him turned too sharply, into the oncoming traffic lane. Post did not commit any violation of any traffic law.

¶ 57. When considering whether reasonable suspicion exists, a court must consider all the circumstances. Yet, the majority opinion omits many factors under its application of the totality of the circumstances standard.

¶ 58. This case, like all stops for reasonable suspicion, turns on the details. Yet the parties did not create a careful record of the facts at the suppression hearing. They were too focused on the legal issue whether, as a matter of law, deviation within a single lane of traffic justifies a traffic stop. Judge Richard Posner's comment in a recent case in which the parties failed to present concrete facts to support their respective positions fits the present case: "This case illustrates the curious and deplorable aversion of many lawyers to visual evidence and exact measurements (feet, inches, pounds, etc.) even when vastly more informative than a verbal description."[9]

¶ 59. The majority opinion concedes that this is a close case.[10] Because the parties and circuit court did not view this case from the perspective of the totality of the circumstances and did not provide the circuit court or this court with an adequate record to determine the

_____

[9] *Coffey v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 479 F.3d 472, 478 (7th Cir. 2007).

[10] Majority op., ¶ 27.

totality of the circumstances, I would remand the case so that the parties can make an appropriate record.

## III

¶ 60. We are all relieved that the officer stopped Post before his drunk driving could harm anyone, and all of us rely on law enforcement officers to stop drunk drivers. A person who drives under the influence places not just his or her life at risk but also the life of any person who is in the same place at the same time as the intoxicated driver.

¶ 61. This case is a hard case because it is difficult for a court to declare a stop unconstitutional when the stop revealed that the driver was, in fact, operating a motor vehicle while under the influence. It is especially hard to cut Post any slack because this was the fifth time (not counting any times Post drove while intoxicated but evaded detection) that Post drank his alcoholic beverages, picked up his car keys, and brazenly and illegally got into the driver's seat.

¶ 62. But as United States Supreme Court Justice Antonin Scalia has wisely explained: "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."[11]

¶ 63. For the reasons set forth, I would remand the cause to the circuit court for an evidentiary suppression hearing to determine the facts surrounding the stop and to determine whether they justified an investigative stop.

[11] *Arizona v. Hicks,* 480 U.S. 321, 329 (1987).