STATE of Wisconsin, Plaintiff-Respondent,

v.

Lee Anthony BATT, Defendant-Appellant.†

Court of Appeals

*No. 2009AP3069–CR. Submitted on briefs August 24, 2010.*
*—Decided October 6, 2010.*

2010 WI App 155

(Also reported in 793 N.W.2d 104.)

† Petition for review denied 1-11-11.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Chad A. Lanning* of *Lanning Law Offices, LLC* of West Bend.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Anne C. Murphy*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. BROWN, C.J. Lee Anthony Batt is appealing his sixth operating while intoxicated conviction on two separate grounds. First, he claims that there was no reasonable suspicion to pull him over because the police based the initial stop on an anonymous tip that was not sufficiently corroborated. Second, Batt claims that the police did not afford him a reasonable opportunity to obtain a third test of his choice for intoxication as required by Wis. Stat. § 343.305(5)(a) (2007–08),[1] Wisconsin's "implied consent" statute. He bases this claim on the fact that—after he was given a second chemical test provided by law enforcement—the arresting officer did not ensure that he was able to make a phone call to get a third test of his choice done when he was taken to jail. The trial court rejected both of his claims. Because we believe that the initial stop was justified under the totality of the circumstances, and because we also believe that he is entitled to one alternative test, not two, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

## FACTS

¶ 2.  On the evening of August 10, 2008, a city of Sheboygan police officer was dispatched to investigate an anonymous tip[2] that two cars were speeding near Roosevelt Park. The vehicles were described as a red SUV and a white Dodge truck with yellow lights. As the officer approached the area, he encountered a white Dodge truck with yellow lights on top of it coming towards him. He turned around and got behind the truck so he could follow it. He did not notice any unlawful behavior on the part of the driver, but he did see a group of people gesturing towards the truck while looking at him. He testified that he understood that to mean that the truck he was following was the one he was looking for. At that point, the truck turned into the driveway, and the officer turned on his emergency lights to initiate a traffic stop.

¶ 3.  Batt was the driver of the vehicle. At some point after the stop, he was placed under arrest for driving under the influence of an intoxicant. Pursuant to Wis. Stat. § 343.305(4), the officer read Batt the Informing the Accused form. He testified that he read it verbatim. The form reads, in relevant part:

---

[2] There was disagreement between the parties as to whether the initial tip was from one person or from several people. In his reply brief, Batt points out that there was no record made as to how many citizens complained before the officer was dispatched and complained that the State nonetheless makes reference to "the tip from several citizens." We do not see the question of how many people initially complained to the police as relevant to our holding, and we are content to decide the case on the assumption that only one person made the initial call, but several people later made gestures to Batt's truck.

163

> This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system . . . .
>
> If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

He then asked Batt to submit to a chemical test of his blood, and Batt consented. The officer testified that while they were waiting for his blood to be drawn, Batt asked for the alternative test provided by the police department—in this case, a breath test. The officer administered the breath test as requested.

¶ 4.   At some point, Batt also requested a third test by a qualified person at his expense. The officer explained that he would have to make his own arrangements for that test. He also told Batt that he would be going to jail because he was under arrest for a felony. He told Batt that while he was on his own to make arrangements for the third test, the jail personnel might allow him to make a phone call to do so. He did nothing to ensure that Batt was able to make a phone call, and there is no indication in the record that Batt got a third test.

¶ 5.   Ultimately, Batt was charged with and convicted of operating while under the influence (5th or 6th), a felony.[3] His trial counsel moved to suppress the

---

[3] While the record shows that this was his sixth conviction, WIS. STAT. § 346.65(2)(am)5. sets the same penalty scheme for both fifth and sixth convictions.

results of the blood and breath tests by claiming that the initial police stop was not justified by reasonable suspicion or, alternatively, the "frustration and/or denial of right to additional test." The trial court denied both motions, and Batt subsequently pled no contest to the charges. Batt appeals.

## DISCUSSION

¶ 6. We begin with the more complex and interesting issue: whether Batt was denied a right to a third test at his own expense. As a threshold matter, we must determine what Batt's rights were under Wis. Stat. § 343.305(5)(a). Batt argues that case law has interpreted this statute to require that law enforcement offer *both* an alternative test at police expense *and,* in addition, a reasonable opportunity to obtain a third test at the person's own expense. The State counters that the language of the statute clearly indicates that Batt was only entitled to *either* the law enforcement-provided alternate test *or* a reasonable opportunity to a test at his own expense.

■

¶ 7. This is a question of statutory construction, which we review de novo. We "begin[] with the language of the statute." *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. Wisconsin Stat. § 343.305(5)(a) reads, in pertinent part:

> The person who submits to the test is permitted, upon his or her request, the alternative test provided by the agency . . . or, at his or her own expense, reasonable opportunity to have any qualified person of his or her own choosing administer a chemical test for the purpose specified . . . .

165

On first read, we agree with the State that the plain language of the statute seems to indicate, through the use of the word "or," that the statute contemplated that defendants would receive one test or the other—but not necessarily both.

¶ 8. However, Batt cites to binding precedent—*State v. Stary*, 187 Wis. 2d 266, 270, 522 N.W.2d 32 (Ct. App. 1994)—for the proposition that the statute actually requires law enforcement to provide Batt with both opportunities. And it is true that *Stary* states:

> [WISCONSIN STAT. §] 343.305(5), therefore, imposes three obligations on law enforcement: (1) to provide a primary test at no charge to the suspect; (2) to use reasonable diligence in offering and providing a second alternate test of its choice at no charge to the suspect; and (3) to afford the suspect a reasonable opportunity to obtain a third test, at the suspect's expense.

*Stary*, 187 Wis. 2d at 270. At first glance, the *Stary* court's use of the word "and" seems to indicate that it interpreted § 343.305(5)(a) to require law enforcement to fulfill three separate obligations.

¶ 9. What Batt fails to point out is that the paragraph immediately preceding the paragraph cited by him appears to contradict his assertion about the holding in *Stary*. It reads:

> Once a person consents to the primary test requested by law enforcement, he or she is permitted, at his or her request, an alternate test the agency chooses *or, alternatively,* a reasonable opportunity to a test of his or her choice. "*If for any reason the accused does not want the agency's secondary test,* the accused may choose and pay for his or her own test at an approved facility." Thus, law enforcement must provide a reason-

able opportunity for the accused to obtain his or her own alternate test, within the three-hour time limit from the time of the stop.

*Stary*, 187 Wis. 2d at 270 (emphasis added; citations omitted). That paragraph, unlike the one cited by Batt, seems to support the State's "either/or" interpretation of the statute. Because of this apparent contradiction, we look to the context surrounding the language in *Stary*—the facts of the case—to better understand what the *Stary* court intended to say.

¶ 10. In *Stary*, the defendant was arrested, like Batt, on suspicion of OWI. *Id.* at 268. He was offered an alternative test at agency expense "at least four times." *Id.* Unlike Batt, he refused each time and was released in time to obtain a test on his own. *Id.* at 267–68. Just after his release, a medical center contacted the arresting officer to say that Stary was requesting a blood test and to ask whether the police would be paying, and the officer said no. *Id.* at 268. The court held that on those facts, the officer was under no obligation to agree to have the police pay for the test. *Id.* at 271–72. It also held that law enforcement had complied with its obligation to provide a reasonable opportunity for a test at Stary's own expense. *Id.* at 272. Therefore, the *Stary* court was not considering whether a defendant was entitled to a reasonable opportunity to a third test after receiving a second test at agency expense.

¶ 11. We interpret *Stary*'s "three obligations" to mean, in context, that when law enforcement invokes Wis. Stat. § 343.305 to obtain a primary test, it must (1) provide the primary test of its choice at its own expense; (2) provide an opportunity for a second test of its choice at agency expense; and (3) *if the second test is*

167

*refused by the suspect in favor of one at his or her own expense,* it must provide a reasonable opportunity for a test of the suspect's choice at the suspect's expense. In other words, in any given case, law enforcement may only need to pay for the primary test and provide an alternate test at agency expense. However, because the choice of who pays for and arranges the alternate test is the defendant's, law enforcement must be *prepared* to offer *either* the second test at agency expense *or* a reasonable opportunity for a test at the suspect's expense, in addition to paying for the first test—hence the term "three obligations" that was used by the *Stary* court.[4] *See Stary,* 187 Wis. 2d at 270.

¶ 12. Our interpretation of *Stary* is strengthened by other case law discussing the same WIS. STAT. § 343.305(5)(a) provision. In *City of Madison v. Bardwell,* 83 Wis. 2d 891, 896, 266 N.W.2d 618 (1978), our supreme court observed that "[b]y allowing the agency to designate the first test, but to be prepared to administer an additional test, the legislature has insured that even an indigent driver who complies with the law can have the benefit of a second test regarding the degree of his intoxication." As we see it, if we were to adopt Batt's interpretation of § 343.305(5)(a), people who could afford to would have the advantage of taking three tests,

---

[4] We note that, despite language in *State v. Stary,* 187 Wis. 2d 266, 270, 522 N.W.2d 32 (Ct. App. 1994), if a suspect refuses a first test, law enforcement need not provide any opportunity for additional tests. *See* WIS. STAT. § 343.305(5)(a); *City of Madison v. Bardwell,* 83 Wis. 2d 891, 896, 266 N.W.2d 618 (1978) ("Only if [the defendant] submits to the designated test may he [or she] have an alternate test and still comply with the law."). This further supports our observation that the "three obligations" language does not mean all three must be offered in every case.

while the indigent and those less well-off would be hard pressed to do the same. This cannot be what the legislature intended.

¶ 13. Our supreme court reemphasized the importance of the second test in *State v. Walstad*, 119 Wis. 2d 483, 527, 351 N.W.2d 469 (1984):

> In Wisconsin, the right to a *second test* is protected by statutory law, and it is, we believe, an assurance of constitutional due process. The *second test* affords the defendant the opportunity to scrutinize and verify or impeach the results of the breathalyzer test administered by enforcement authorities. Additionally, the legislation requires that an apprehended driver be advised of the absolute right to *a second test*. This is a legislatively conferred right which we will strictly protect. (Emphasis added.)

Thus, we are quite comfortable with concluding that both the plain language of Wis. Stat. § 343.305(5)(a) and binding case law support our conclusion that once Batt accepted the second test, law enforcement was not obligated to give him a reasonable opportunity to obtain a test at his own expense.

¶ 14. Although Batt's appellate brief emphasizes *Stary*'s alleged requirement that three opportunities be provided, his account of the facts appears to raise a different, though related issue: whether law enforcement failed to comply with Wis. Stat. § 343.305(5)(a), because even though Batt did take the law enforcement-provided test, his request to police was actually for a second test at his own expense. Indeed, this was the issue initially raised to the trial court. It appears to be based on the idea that Batt initially requested a test at his own expense and only agreed to

169

the test at agency expense after being told that he would have to make arrangements on his own and that he would be taken to jail because he was under arrest for a felony.

¶ 15.   As Batt points out, it is unclear from the record whether Batt first requested a test at his own expense before or after agreeing to the second test paid for by law enforcement. Batt himself did not testify. The officer testified that he could not remember the exact sequence of events. What is clear, however, is that Batt did eventually agree to the test offered by law enforcement, and there is no indication in the record that he was misled by the police before doing so. The trial court found as fact that the officer did provide "an alternative test upon request that was available to be administered," and that finding is not clearly erroneous. We need discuss this no further.

■

¶ 16.   Now on to Batt's other issue:   whether the officer had reasonable suspicion to stop him in the first place. This is a question of constitutional fact, so we apply a two-step analysis. *State v. Post*, 2007 WI 60, ¶ 8, 301 Wis. 2d 1, 733 N.W.2d 634. First, we will uphold the trial court's findings of fact unless they are clearly erroneous. *Id.* Next, we apply those facts to constitutional standards de novo. *Id.*

■

¶ 17.   In deciding that the officer had reasonable suspicion to detain Batt, the trial court made the following observations:   that the officer received a report (an anonymous tip) describing "inappropriate driving" by someone in a white truck with yellow lights, that the officer encountered the truck five minutes later within several blocks of the park designated by the tip, and that the officer saw several people signal

170

toward the truck in a way the officer interpreted to mean that was the truck that had been called in. All of these facts are supported by the record.

¶ 18.   Reasonable suspicion is, in a nutshell, less than probable cause, but more than a hunch. *See id.*, ¶ 10 (citing *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968)). Law enforcement officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," justify the intrusion—here, a traffic stop. *See Terry*, 392 U.S. at 21. The determination of reasonableness is an objective, commonsense test based on the totality of the circumstances at the time of the stop. *Post*, 301 Wis. 2d 1, ¶ 13.

¶ 19.   Batt focuses much of his argument on the case law addressing reasonable suspicion based on anonymous tips. He points out that Fourth Amendment case law has treated stops based primarily on informant tips as worthy of more scrutiny than stops based on direct police observations. *See, e.g., State v. Rutzinski*, 2001 WI 22, ¶¶ 16–18, 241 Wis. 2d 729, 623 N.W.2d 516. He concedes that information by a tipster may, in some cases, justify a traffic stop. *See id.*, ¶ 17. He emphasizes, however, that *anonymous* informant tips, because they involve tipsters whose veracity is by nature unknown, require some corroboration before a stop may be justified. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000).

¶ 20.   We agree with Batt's overview of the law, but we disagree with his application of his facts to the law. He contends that his case is like *J.L.*, where the Supreme Court held that a stop was unjustifiable where an anonymous tipster stated merely that a "black male" wearing a "plaid shirt" was standing at a particular bus

171

stop and carrying a gun. *See id.* at 268. The Court in *J.L.* highlighted that the tip contained no information as to how the tipster knew the individual was carrying a gun and no predictive information, and no information as to the identity of the tipster. *Id.* at 271–72.

¶ 21.  We see Batt's case as very different from *J.L.* First, the description of Batt's vehicle was more specific than the one in *J.L.*—a white Dodge truck with yellow lights limits the field of possible suspects considerably more than a "black male" wearing a "plaid shirt." Second, there were tipsters in this case, unlike in *J.L.*, who may have opened themselves up to identification. They were right there at the scene. The trial court stated, "I think it is very reasonable that the officer . . . conclude[d] that obviously these are the individuals that had made the initial report and asked for police intervention." We agree—these individuals made eye contact with the police and gestured toward a car that was, at the time, obeying traffic laws. And if their intention was to point out earlier illegal activity, as the trial court and the officer believed it to be, then they were not totally anonymous at the time of their gestures.

¶ 22.  Finally, the Court in *J.L.* expressed a concern that the tip in that case was reliable only in the sense that it "help[ed] the police correctly identify the person whom the tipster [meant] to accuse. *Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.*" *Id.* at 272 (emphasis added). Here, the criminal activity was not concealed, so the basis for the initial tipster's knowledge was easily inferred—he or she would have seen a car speeding and/or running stop signs.

172

¶ 23. We emphasize that the test for reasonable suspicion—anonymous tipster or not—is based on the totality of the circumstances, which is a fact-dependent test. *See Post*, 301 Wis. 2d 1, ¶ 13. Here, there was an initial anonymous tip providing a sufficient description to allow the officer to identify a particular vehicle. Then, the officer was able to further confirm his identification of this vehicle as the one in question when a group of people standing in the area of the original tip gestured toward the vehicle he suspected. Because the criminal activity he was originally investigating (speeding) would have been visible to the public, he had no reason to doubt the basis of the anonymous tipster's knowledge. Under the totality of the circumstances, we believe that the officer had reasonable suspicion to make the traffic stop.

*By the Court.*—Judgment affirmed.