STATE of Wisconsin, Plaintiff-Appellant,

v.

Carl RISSLEY, Defendant-Respondent.

Court of Appeals

*No. 2011AP1789–CR. Submitted on briefs June 29, 2012. —Decided September 1, 2012.*

2012 WI App 112

(Also reported in 824 N.W.2d 853.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Katherine D. Lloyd*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *John W. Campion* of *John Campion Law Office* of Racine.

Before Brown, C.J., Reilly and Gundrum, JJ.

¶ 1. BROWN, C.J. The State appeals from an order granting Carl Rissley's motion to suppress all evidence obtained during a roadside stop of his vehicle by police. The trial court held that it was not a valid *Terry*[1] stop, mainly because Rissley had committed no crime. We disagree. There was reasonable suspicion that Rissley trespassed on the property of a person he did not even know just before 3:00 a.m., confronted the homeowner in the homeowner's driveway, demanded to know the whereabouts of "Pookie"—a person with whom the homeowner was unfamiliar—left only when the home-owner called the police, and sped off "like a bat out of hell." The homeowner told the police dispatch about the incident, saying that this was not the first time this person had approached him and that the man had "threatened" him. We agree with the State that police had reasonable suspicion of criminal activity being afoot. In addition to the State's assertion of disorderly conduct, we see suspicion of criminal trespass, speed-ing, erratic driving, and perhaps stalking. At any rate, there was more than enough to stop Rissley and inves-tigate. Further, we reject Rissley's assertion that there is a bright-line rule mandating that courts exercise caution in supporting a *Terry* stop whenever the stop is for a "minor crime." There is no such bright-line rule. We reverse and remand with directions.

¶ 2. The facts relevant to this appeal are derived primarily from a transcript of the complainant's call to

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

the Caledonia Police Department. On April 17, 2010, at 2:53 a.m., a homeowner reported that an unknown man had just threatened him in his driveway and was "staring right down the driveway right now." The homeowner reported that he was parking his truck in his driveway when he encountered the man, who was "looking for a guy named Pookie." After the homeowner asked who Pookie was, the man replied, "That's your son." The homeowner then informed the man that he did not have a son at home and that he was alone at the house.

¶ 3. The homeowner told the dispatcher that, after he informed the man of his intention to call the police, the man "took off like a bat out of hell." While the homeowner was on the phone with dispatch, he watched the man drive away and gave continuous updates to the dispatcher. The homeowner described the man's vehicle as a beige Chevy minivan travelling on Six Mile Road toward Middle Road, and eventually turning south onto Middle Road. He stated that he was unable to provide the minivan's license plate number because gravel was kicked up as the van departed. The homeowner also provided a description of the man: Caucasian, wearing a hooded sweatshirt, and clean shaven with a crew-cut hairstyle. In between describing the suspect's conduct and whereabouts, the homeowner informed the dispatcher that he had dealt with the man "many times" and that he had previously called the Caledonia police on the man.

¶ 4. While still on the phone with the homeowner, the dispatcher sent a patrol car to the area, telling the patrol officer there had been "some sort of [disorderly conduct]." The officer, who was driving a marked car, began to head in the direction of the homeowner's house on Six Mile Road while the homeowner continued

to update dispatch as to the suspect's location and driving. The officer first saw a vehicle matching the homeowner's description after the vehicle turned south onto Middle Road from Six Mile Road. At that point, the officer was too far away to observe the suspect's driving or rate of speed.

¶ 5. The officer never lost sight of the vehicle and increased his speed to catch up to the van. He observed it from a trailing distance of about four car lengths for one and one-half miles, or roughly three minutes, while he waited for further information from the dispatcher. He testified that he did not witness any traffic violations during that time. At 2:58 a.m., five minutes after the homeowner called the police, the officer pulled over the vehicle because it "matched the description and direction of travel" of the minivan given by the homeowner.

¶ 6. The traffic stop revealed that the suspect was Carl Rissley. After smelling alcohol on Rissley, the officer performed field sobriety tests on him. Rissley was arrested for operating while intoxicated—fifth offense, at 3:18 a.m.

¶ 7. Once charged, Rissley moved to suppress the evidence from the traffic stop, contending that the initial stop was not supported by the requisite reasonable suspicion. The trial court granted his motion to suppress. Although the trial court commented that the homeowner's complaint was "legitimate," it found that there was no articulation of facts showing that a crime had occurred or was about to occur. The trial court also found that the officer lacked a reasonable belief that the vehicle he stopped on Middle Road was the vehicle that had fled from the homeowner's residence, noting that "there are at least seven roads going east or west off Middle Road south of Six Mile Road before Five-and-a-

427

half-mile Road," where the officer originally spotted the vehicle. On that basis, the trial court suppressed the evidence.

*Suppression of Evidence Issues*

¶ 8. We first address the issues related to the suppression of evidence. Whether a traffic stop is reasonable is a question of constitutional fact involving a two-step standard of review. *State v. Post*, 2007 WI 60, ¶ 8, 301 Wis. 2d 1, 733 N.W.2d 634. First, we review the trial court's findings of fact under the clearly erroneous standard. *Id*. Next, we review the application of those facts to constitutional principles de novo. *Id*. Here, the trial court found that the homeowner's call was a "legitimate citizen complaint," and that finding is not challenged by Rissley, so we focus our inquiry on whether the facts the homeowner related in that call gave rise to reasonable suspicion justifying the ensuing stop.

¶ 9. The test for determining whether reasonable suspicion exists is based on an objective standard and takes into account the totality of the circumstances. *State v. Williams*, 2001 WI 21, ¶ 22, 241 Wis. 2d 631, 623 N.W.2d 106. Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion of the stop. *Post*, 301 Wis. 2d 1, ¶ 10 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "The crucial question is whether the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit

a crime." *Post*, 301 Wis. 2d 1, ¶ 13. That commonsense approach "balances the interests of the State in detecting, preventing, and investigating crime and the rights of individuals to be free from unreasonable intrusions." *Id.*

¶ 10. However, important to our decision in this case, the constitutional standard of reasonableness for a seizure is not met solely based on the presence of reasonable suspicion. *See State v. Guzy*, 139 Wis. 2d 663, 679, 407 N.W.2d 548 (1987). "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " *Terry*, 392 U.S. at 21 (alteration in original; citation omitted). In evaluating the need to seize, the court must consider the governmental interests involved. *See id.* at 22. In *Terry*, the governmental interests were those of crime prevention and the need to temporarily *freeze* a situation to resolve ongoing, possibly criminal, ambiguities. *See id.* However, "[t]he factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct." *United States v. Hensley*, 469 U.S. 221, 228 (1985).

¶ 11. So, apart from the trial court's determination that there was no reasonable suspicion of a crime being committed, we need to decide whether there existed a need to temporarily freeze the situation to resolve ongoing, possibly criminal, ambiguities. We first look to the label given to this incident by the dispatcher —that some kind of disorderly conduct was occurring.

429

WISCONSIN STAT. § 947.01 (2009–10)[2] states that "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance" is engaging in "disorderly conduct." We agree with the State that the appellation given by the dispatcher was a proper one. The tape of the call by the homeowner tells this story: The homeowner called and asked, "Can you send a squad down this road? This guy just threatened me in front of my house . . . . I don't even know who the guy is. He's looking for a guy named Pookie. I don't even know the guy. He confronted me in my driveway." When the dispatcher asked, "He confronted you in your driveway?" the homeowner responded, "Exactly he's been around many times." The homeowner also reported that when he told the man he was going to call the police, the man responded by "star[ing] him down" and then took off in his van like a "bat out of hell." The homeowner said that he tried to get the license plate number but "[t]he gravel . . . kicked up at me I couldn't even see the plate number."

¶ 12. The homeowner gave the dispatcher a running account of not only how the man was driving his van, but where. He told the dispatcher:

> He's on 6–mile going up Middle Road. He's in a beige van and he's speeding like hell. He's speeding like a mad man. He's going to hit Middle Road very quick.
>
> . . . .
>
> He's at Middle Road right now. By the Citgo station.
>
> . . . .

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

He's sitting at the stop sign.

. . . .

He's got his signal on to go right.

. . . .

He's turned left on Middle Road.

. . . .

It's a beige Chevy van.

. . . .

You can see the gravel mark when he turned the corner . . . .

¶ 13. All of this occurred just before 3:00 a.m. When a citizen is confronted in his driveway by an unknown stranger at this time in the morning, and the unknown stranger asks him the whereabouts of "Pookie" and claims that "Pookie" is the citizen's son and the citizen has no son at home, and where this strange person has been around before such that the citizen has called the police, a reasonable police officer can suspect that the unknown man is tending to provoke a distur-bance such that the incident should be investigated to clear up any ambiguity. Not only was there criminal ambiguity that might warrant a charge of disorderly conduct, Rissley's behavior also warranted investigation for possible criminal trespass, and maybe even stalking, especially because of information that this was a case of continuing, unwelcome contact on a homeowner's prop-erty.
█

¶ 14. We hesitate to put words in the trial court's mouth, but it appears that the court was of the idea that a reasonable police officer would think this was merely

431

a case of mistaken identity and that Rissley was trying to find a "Pookie" and mistakenly thought Pookie was the homeowner's son who lived there. But the law is that police are not required to rule out a supposedly innocent explanation for the conduct before initiating a stop. *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990).

¶ 15. Rissley contends that, even if there was reasonable suspicion that a crime had been committed on the homeowner's property, there was no reasonable suspicion that his van was the one connected to the crime. The trial court agreed with Rissley. We do not. We start with *Guzy*, the seminal opinion relied upon by both parties. *Guzy*, 139 Wis. 2d at 663. This opinion forged the list of factors to be considered:

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

*Id.* at 677 (citation omitted). The *Guzy* court emphasized that the above list is not exhaustive, nor do all of the factors have to be present to justify a stop. *Id.* Rather, the focus is on the facts and circumstances present in each case. *Id.* at 679.

¶ 16. Four of the six factors favor the State and the remaining two are irrelevant. In particular, the second and fourth—the size of the area in which the offender might be found and the known probable direction of flight—strike us as particularly favorable to the

State. Only five minutes passed between the homeowner calling the police and the police stopping Rissley's van. When the homeowner made the call, Rissley had not yet left the homeowner's residence. Shortly thereafter, the homeowner described Rissley as "speeding like a mad man" away from his residence. He narrated the direction of travel and the vehicle's location until it turned, at which point he told the dispatcher that the suspect was headed "south" on Middle Road. Soon after the turn, an officer reported to dispatch that he saw taillights going south on Middle Road. The officer then followed Rissley for one and one-half miles, which he estimated took about three minutes, before pulling him over. So, very little time passed since the homeowner had ended his ongoing description of Rissley's whereabouts. Moreover, this is not a situation where a citizen simply reports the make and color of the car and the direction initially traveled and then loses sight of the vehicle so that the pursuing officer has to use some combination of logic and guesswork to locate the fleeing vehicle. The homeowner gave a running account and even witnessed the van turn onto Middle Road. While we are aware, as pointed out by the trial court, that there are at least seven intersecting roads on Middle Road between the left turn onto Middle Road and the stop, and while Rissley relies on this comment by the trial court as reason to support the suppression order, the chances of there being another beige Chevy van on Middle Road in such a short time span at about 3:00 a.m. going in a certain direction of travel are slim. All the officer had to do was follow the trail that the homeowner had described. Only five minutes passed between the homeowner's call and the stop, hardly enough time for all sorts of intervening activity to occur, given the time of night on a rural road.

¶ 17. The foregoing discussion also brings into focus factors one and three—the description of the vehicle in which the suspect fled and the number of persons in the area—as weighing in favor of stopping the vehicle to investigate. As we just stated, the homeowner described the vehicle as a "beige Chevy van."[3] And although there is no testimony specifically stating how many other vehicles were on the road, we can infer from the fact that it was nearly three o'clock in the morning and by the officer's ability to spot the van's taillights at a distance that other cars were not a factor.

¶ 18. The last two factors—observed activity of the person stopped and police knowledge that the person has been involved in similar criminal activity in the past—are not relevant here. The police knew nothing about the vehicle's driver when they pulled him over and had observed no illegal behavior independently before doing so. Given the strength of factors one through four, however, and looking at all of the facts and circumstances of this case, it was reasonable for police to believe that the van that was spotted going

[3] Although the trial court found that the officer was unable to observe whether the vehicle (or, presumably, its driver) matched the description given before executing the stop, once Rissley was pulled over, the officer could quickly have let Rissley go on his way if the car and/or the driver had not matched the description given—a Caucasian male with a crew cut wearing a hoodie. The fact that the officer was unable to observe the person driving the van until after the stop strikes us as immaterial. This is particularly true because the officer had no way to identify the suspect or investigate further without making the stop. *See State v. Guzy*, 139 Wis. 2d 663, 682, 407 N.W.2d 548 (1987) (stop upheld in part because it allowed officers a minimally intrusive means to quickly corroborate a physical description and because there were no other means to further the investigation).

south on Middle Road was the same van reported by the homeowner to the police. More importantly, it was reasonable to stop the van as part of the ongoing investigation regarding the conduct reported by the homeowner.

■

¶ 19. Perhaps recognizing the difficulty of arguing that there are no facts to support reasonable suspicion that a crime had occurred, Rissley complains in his brief that the officer making the stop did not exercise independent discretion and instead merely followed the directions of the dispatcher when stopping Rissley. We reject this argument. As the State points out, under the collective knowledge doctrine, "[t]he police force is considered as a unit and where there is police-channel communication to the arresting officer and he acts in good faith thereon, the arrest is based on probable cause when such facts exist within the police department." *State v. Mabra*, 61 Wis. 2d 613, 625–26, 213 N.W.2d 545 (1974). The same reasoning applies to cases involving investigatory stops based on reasonable suspicion. *See State v. Pickens*, 2010 WI App 5, ¶¶ 11–12, 15–17, 323 Wis. 2d 226, 779 N.W.2d 1; *see also Hensley*, 469 U.S. at 232 ("[I]f a . . . bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that . . . bulletin justifies a stop . . . ."). Thus, in this case, we consider the information available to both the dispatcher and the police officer who made the stop when deciding whether the stop was justified by reasonable suspicion. The officer making the stop was simply not required to exercise his independent discretion. The fact that he made the stop based on information from dispatch and dispatch had information amounting to reasonable suspicion is enough.

## Seriousness of the Offense

¶ 20. We now address Rissley's argument that the stop was unreasonable based on the gravity of the conduct reported by the homeowner. Rissley points out that according to LaFave, "the *Terry* rule *should be* expressly limited to investigation of serious offenses." 4 Wayne R. LaFave, Search and Seizure § 9.2(c), at 301 (4th ed. 2004) (emphasis added). Based on the LaFave comment, Rissley argues that courts must consider the seriousness of the offense when examining whether the stop was justified.

¶ 21. The LaFave comment cites *Hensley*, 469 U.S. at 221, as "[t]he clearest indication that, at least sometimes, a *Terry* stop is impermissible for a minor offense." LaFave, § 9.2(c), at 300. In *Hensley,* the defendant was a suspect featured in a "wanted flyer" based on his alleged participation in an armed robbery. *Hensley,* 469 U.S. at 223. Nearly two weeks after the robbery, without knowing whether a warrant had been issued, police pulled Hensley over based on information that he had been featured in the flyer. *Id.* at 223–24.

¶ 22. *Hensley* was all about reasonable suspicion of *past* criminal conduct as the basis for a stop. *Id.* at 227.

> The proper way to identify the limits [on investigatory stops based on past criminal activity] is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.

*Id.* at 228. Ultimately, the *Hensley* court held that "if police have a reasonable suspicion, grounded in specific

and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley*, 469 U.S. at 229. It explicitly declined to address *Terry* stops based on other, lesser past crimes. *Hensley*, 469 U.S. at 229.[4]

¶ 23. *Hensley*, and by attribution, the LaFave comment, would have relevance if the stop in this case were based purely on suspicion that Rissley had committed a misdemeanor in the past. But this is not a *Hensley* case. Rather, police in this case were investigating an ongoing situation—criminal conduct that had been reported mere minutes before the stop and had the potential to happen again. So while it is true that police had reasonable suspicion *in part* based on Rissley's having bothered the homeowner before, police also had reasonable suspicion of crime committed in real time, just moments before. It was not a stop based on some flyer or a dated warrant, but one that was part of a fluid situation.

¶ 24. A careful reading of *Hensley* supports our conclusion that this case is distinguishable from "past

---

[4] Since *United States v. Hensley*, 469 U.S. 221 (1985), courts have come to differing conclusions as to whether investigatory stops should be allowed based on reasonable suspicion of past misdemeanor criminal conduct. *See, e.g., United States v. Moran*, 503 F.3d 1135, 1142–43 (10th Cir. 2007) (holding that an investigatory stop involving repeated reports of trespass by a particular individual was reasonable under the circumstances); *United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007) (holding that an investigatory stop based on a reported past noise violation was unreasonable under the circumstances, but refusing to per se ban investigatory stops based on suspected past misdemeanors); *Blaisdell v. Commissioner of Pub. Safety*, 375 N.W.2d 880, 883–84 (Minn. Ct. App. 1985) (adopting a per se rule against investigatory stops based on completed misdemeanors).

offense" cases. The *Hensley* court differentiated between stops "to investigate suspected *ongoing* criminal activity" and stops "to investigate an already completed crime," noting that "the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards." *Id.* at 228 (emphasis added). In this case, police were not stopping the suspect of a disorderly conduct offense "long after[]" the offense was committed. *See id.* Rather, as we already noted, police were acting in the heat of the moment to investigate an ongoing situation and freeze time so that any ambiguities in potentially criminal conduct could be resolved.[5] Because of that, the interests in this case are more akin to a traditional *Terry* stop than to the situation in *Hensley*. Thus, Rissley's reliance on LaFave is misplaced.[6]

---

[5] This is, of course, different from the doctrine of "hot pursuit," which allows warrantless search for a suspect after an "immediate or continuous pursuit of [a suspect] from the scene of a crime." *State v. Richter*, 2000 WI 58, ¶ 32, 235 Wis. 2d 524, 612 N.W.2d 29 (citations omitted). In such cases, the gravity of the offense is "an important factor to be considered when determining whether any exigency exists." *State v. Ferguson*, 2009 WI 50, ¶ 27, 317 Wis. 2d 586, 767 N.W.2d 187 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). In *Welsh*, the Supreme Court held that the arrest in that case, involving a "noncriminal, civil forfeiture offense for which no imprisonment is possible," was not an appropriate use of the "hot pursuit" exception. *Welsh*, 466 U.S. at 754. The "hot pursuit" doctrine allows warrantless entry into a private home, which is a much greater intrusion than a traffic stop and thus requires a greater governmental interest to be reasonable. *See Hensley*, 469 U.S. at 228.

[6] We do note, however, that despite limiting its holding to past felonies, the *Hensley* court grouped felonies together with other "crimes involving a threat to public safety." *Hensley*, 469 U.S. at 229. An argument could be made that even if police in this

*By the Court.*—Order reversed and cause remanded with directions.

case were investigating only past conduct, that conduct, though not felonious, involved a threat to public safety based on Rissley's reported conduct at the residence and his reported driving away from the scene.