COURT OF APPEALS
DECISION
DATED AND FILED

March 19, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2024AP691-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2022CF168

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

JODY WILLIAM SOLOM,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: MICHAEL O. BOHREN, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

¶1 GUNDRUM, P.J. Jody William Solom appeals from a judgment convicting him of operating a motor vehicle while intoxicated (OWI), sixth offense. He asserts the circuit court erred in denying his motion to suppress evidence derived from an investigative stop. For the following reasons, we disagree and affirm.

## BACKGROUND

¶2 Following his arrest for OWI, sixth offense, Solom filed a motion to suppress evidence arguing the investigative stop by the arresting law enforcement officer was unlawful. The officer was the only witness to testify at the evidentiary hearing on the motion, and he testified as follows.

¶3 Around 5:33 p.m. on January 28, 2022, the officer was on patrol when he received a dispatch relaying the report of a witness who had observed a red Honda Civic "go through a stop sign and hit a snowbank." The witness, whom the officer stated was a "named witness,"[1] further reported that the Civic was damaged, leaving the scene, and traveling westbound on Main Street. The officer was traveling eastbound on Main Street.

¶4 Approximately two to three minutes after receiving the dispatch, the officer observed a red Honda Civic traveling westbound on Main Street about a mile from where the witness indicated he observed a red Honda Civic hit a snowbank. The officer agreed the Civic was "coming from the direction the citizen witness reported" and that he did not observe "any other red Honda Civics in the area."

¶5 After making a U-turn and following the Civic, the officer observed it to be "varying speeds, increasing speed, decreasing speed, as well as weaving within its own lane." The officer testified that based upon his years of experience investigating "probably between 55 and 100" OWI cases, driving through posted stop signs, weaving within one's lane, and varying speeds are some "indicators" a driver might be intoxicated. Based on the witness's report and the officer's own

---

[1] The circuit court determined the officer could properly deem the witness's report reliable. On appeal, Solom does not challenge the reliability of the witness's report.

observations, which observations the officer testified "would be consistent with somebody who is impaired," the officer effectuated a traffic stop, during which time he identified the driver as Solom.

¶6      On cross-examination, the officer indicated traffic at the time of the stop was likely heavy and as he was heading eastbound on Main Street and Solom was heading westbound, the two directions were divided by a median.  The officer testified that dispatch had informed him that the witness had indicated the front of the Civic was "smashed up."  He further testified that he did not observe damage to Solom's red Honda Civic as it passed him, but when asked if he was "able to observe the front of that vehicle," he responded that he "was able to [briefly] observe the driver's side of the front of the vehicle."  The officer agreed that after he observed Solom's red Honda Civic, he did not look for "any other type of red vehicles."

¶7      On re-direct examination, the officer provided the following testimony.

> [State:]  So you did not see the front of [Solom's] car; is that fair to say?
>
> [Officer:]  Prior to initiating the stop, no.
>
> [State:]  Is it then that the red Honda Civic had already—the front end had essentially passed you before you made the observation of the red Honda Civic; is that fair to say?
>
> [Officer:]  Correct, yes.

Following the testimony, the circuit court denied the suppression motion, concluding the officer had lawfully stopped Solom.

**DISCUSSION**

¶8    Solom contends the arresting officer lacked the reasonable suspicion necessary to perform the traffic stop "because he lacked particularized reasons to believe [Solom's red Honda Civic] was the same vehicle that had crashed into a snowbank." We disagree.

¶9    Our supreme court has fairly recently explained:

> Whether officers had reasonable suspicion to conduct a traffic stop is a legal question that we review de novo, accepting the circuit court's findings of fact unless they are clearly erroneous.
>
> The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." Investigative stops, including traffic stops, are seizures and must therefore comply with the Fourth Amendment.
>
> To conduct an investigative stop, the police must have "reasonable, articulable suspicion that criminal activity is afoot." Reasonable suspicion must be founded on concrete, particularized facts warranting suspicion of a specific individual, not "'inchoate and unparticularized suspicion[s] or hunch[es].'" We assess reasonable suspicion in light of the totality of the circumstances. Thus, we look at the "whole picture" to determine whether the officer had reasonable suspicion, not each fact in isolation.

*State v. Richey*, 2022 WI 106, ¶¶7-9, 405 Wis. 2d 132, 983 N.W.2d 617 (alterations in original; citations omitted).

¶10    In *Richey*, a case upon which Solom relies heavily, our supreme court noted that before conducting the challenged late April traffic stop in that case, the arresting officer was aware that: (1) A sheriff's deputy had reported, as the court phrased it, "a Harley-Davidson motorcycle driving erratically and speeding north on Alderson Street (near the intersection with Jelinek Avenue)" toward Schofield

Avenue; (2) five minutes later, the arresting officer observed a motorcycle, operated by Richey, "driving east on Schofield Avenue a little more than a block west of the intersection with Alderson Street—about a half-mile from the reported location of the speeding Harley"; (3) "Richey's motorcycle was a Harley-Davidson and was the only motorcycle [the officer] saw around the time of the deputy's report"; (4) the officer "followed Richey for several blocks but did not observe any speeding, erratic driving, or other traffic violations"; and (5) "[t]raffic was light that night, and [the officer] had seen relatively few motorcycles out that early in the year." *Id.*, ¶¶2-3, 10. The question for the supreme court was whether the officer's suspicion that Richey "was the erratic driver the deputy saw five minutes earlier" was reasonable. *Id.*, ¶10. The court acknowledged it was "a close question" but concluded that based upon the above facts available to the officer, she did not have reasonable suspicion to conduct the traffic stop. *Id.*, ¶¶10-11.

¶11    The *Richey* court concluded the officer lacked reasonable suspicion because:

> To clear the reasonable-suspicion threshold, [the officer's] suspicions had to be particularized; she needed concrete reasons for believing that Richey's Harley-Davidson and the one seen five minutes earlier speeding north on Alderson Street were one and the same. But the sheriff's deputy's generic description of a Harley-Davidson gave her very little to work with. Except for the manufacturer, she knew nothing specific about the Harley the deputy saw—not the model, type, size, or color, let alone a license plate number. Nor did she know anything about the driver, what he or she was wearing, whether he or she wore a helmet, or even whether the driver appeared to be a man or a woman.

*Id.*, ¶11 (footnote omitted; citations omitted). The court concluded that the officer had merely a "hunch" and not "particularized reasonable suspicion" that the motorcycle she pulled over was the same one the deputy observed five minutes earlier. *Id.*, ¶12. The "description of a Harley-Davidson could apply to a large

5

number of vehicles," it stated, adding "[a]fter all, Wisconsin is the home of Harley-Davidson, and it is one of, if not the most popular manufacturers of motorcycles in Wisconsin." *Id.*

¶12    The *Richey* court made some additional observations.  It noted that both parties acknowledged "that the speed limits in the area were likely the 25 or 30 mile-per-hour limits applicable to most city streets." *Id.*, ¶13.  The court then added, "[e]ven at normal speed, it would take only about a minute to travel [the half-mile] from the location of the deputy's report to where the officer saw Richey," and a driver operating at high-speed, as the deputy reported of the motorcycle he observed, "could have gone much farther in the same amount of time." *Id.*, ¶¶10, 13.  The court concluded,

> [t]hus, in order for Richey to have been the subject of the deputy's report, he would have had to have driven north on Alderson Street at high-speed, ridden around the general area for several minutes, and eventually looped back in the direction he came from while now driving normally.  This unlikely sequence of events, when coupled with the deputy's generic description of a Harley-Davidson headed north on Alderson Street, demonstrates that [the officer's] suspicions were not sufficiently particular to Richey.

*Id.*, ¶13.

¶13    The facts of the case now before us contrast starkly with those in *Richey*.  It is notable right off the bat that the witness's description of the vehicle at issue here—a "red Honda Civic"—provides more specificity than the generic "Harley-Davidson" description found lacking in *Richey*.[2]  The *Richey* court noted the significance that only the manufacturer, Harley-Davidson, was provided as a description of the vehicle in that case, "not the model, type, size, or color." *Id.*, ¶11

---

[2] While Solom cites an internet source for support of his unsurprising assertion that Honda Civics are popular cars, he provides no support for his assertion that "*red* Honda Civics are common." (Emphasis added.)

6

(footnote omitted). In this case, the witness reported not just the manufacturer/maker of the vehicle that hit the snowbank, Honda, but also provided the model, Civic, and color, red.

¶14 Additionally, the location where the officer passed Solom's Civic supports reasonable suspicion more so than the location where the officer found the Harley-Davidson in **Richey**. In **Richey**, the arresting officer first observed the Harley-Davidson only a half-mile from the location where the deputy had reported seeing a Harley Davidson speeding five minutes earlier. *Id.*, ¶10. The **Richey** court noted that "[e]ven at normal speed, it would take only about a minute to travel [the half-mile] from the location of the deputy's report to where the officer saw Richey," and a driver operating at high speed, as the deputy reported of the motorcycle he observed, "could have gone much farther." *Id.*, ¶¶10, 13. And, obviously, in the *five* minutes between when the deputy observed a speeding Harley-Davidson and when the arresting officer observed a nonspeeding Harley-Davidson, the speeding Harley-Davidson observed by the deputy could have traveled much farther yet.

¶15 In the case now before us, the arresting officer had been informed that the red Honda Civic that hit the snowbank was traveling westbound on Main Street. About two to three minutes later, the officer passed a red Honda Civic heading westbound on Main Street about a mile from the snowbank. Since the Civic was being operated on city streets, as opposed to the freeway, the time of two to three minutes corresponds to the officer's passing of the Civic approximately a mile from the snowbank. Thus, the red Honda Civic the officer observed was heading in the direction, on the particular street, and at a distance that corresponded with it being the same red Honda Civic the witness had reported.

7

¶16 Additionally, in *Richey*, the deputy sheriff had reported a Harley-Davidson that was driving erratically and speeding, while the arresting officer "did not observe any speeding, erratic driving, or other traffic violations" with the Harley-Davidson she stopped. *Id.*, ¶10. In this case, however, as the circuit court observed, the varying of speed and weaving the officer observed by the red Honda Civic operated by Solom signaled a "control issue" consistent with the control issue highlighted by the witness's report of a red Honda Civic failing to stop for a stop sign and running into a snow bank. The facts here provide more reasonable suspicion support than the circumstances in Richey.

¶17 Had the officer spotted Solom's red Honda Civic in the location and headed in the direction he did ten seconds or ten minutes after receiving the dispatch, that would change the equation, because if it had been ten seconds, it could not have been the same red Honda Civic, and if it had been ten minutes, it would have been significantly less likely it was the same red Honda Civic. But those are not the facts before us. Here, the chances of another red Honda Civic being driven in the witness-reported direction (westbound) on the reported road (Main Street) and at the location where the officer spotted it (about a mile from the snowbank) at the time the officer spotted it (approximately two to three minutes after the officer received the dispatch report) and with a noticeable "control issue" are slim. *See State v. Rissley*, 2012 WI App 112, ¶16, 344 Wis. 2d 422, 824 N.W.2d 853 ("[T]he chances of there being another beige Chevy van on Middle Road in such a short time span at about 3:00 a.m. going in a certain direction of travel are slim.").

¶18 Solom contends that when the officer conducted the traffic stop, he "lacked particularized reasons to believe" Solom's red Honda Civic was the same red Honda Civic that ran into the snowbank because the officer "did not observe any damage to the front of Mr. Solom's vehicle" and the witness had reported that the

front of the red Honda Civic that went into the snowbank was "smashed up." This contention goes nowhere as the officer's final clarifying testimony related to this point was agreeing that he "did not see the front of [Solom's] car" because "the front end had essentially passed [the officer] before [he] made the observation of the red Honda Civic."[3] Thus, it is not surprising the officer did not see a "smashed up" front of Solom's red Honda Civic when he did not see the front.[4]

¶19 Looking at the totality of the circumstances here—the "whole picture"—if *Richey* was a "close question" on reasonable suspicion, this case lands much closer to a slam dunk. *See Richey*, 405 Wis. 2d 132, ¶¶9, 11 (citation omitted)

*By the Court.*—Judgment affirmed.

Recommended for publication in the official reports.

---

[3] Even the officer's earlier testimony at most indicated that as he passed Solom's red Honda Civic, he only "briefly" observed "the driver's side" of the front of the Civic.

[4] Of note, Solom does not contend reasonable suspicion to pull him over was lacking other than his challenge as to whether there was reasonable suspicion for the officer to believe his red Honda Civic was the same red Honda Civic that went through the stop sign and struck the snowbank. Thus, we need not analyze whether the officer otherwise reasonably suspected that Solom was operating while intoxicated. We additionally need not engage in that analysis because if there was reasonable suspicion that Solom's red Honda Civic was the same Civic the witness observed minutes earlier, which we conclude is the case, there is probable cause, based upon the witness's report, that the driver of the Civic, Solom, had illegally failed to stop for a stop sign, providing that alternative basis for the traffic stop.