COURT OF APPEALS
DECISION
DATED AND FILED

November 21, 2025

Samuel A. Christensen
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2025AP1745-CR**
**2025AP1746-CR**
**2025AP1747-CR**
**2025AP1748-CR**
**2025AP1749-CR**
**2025AP1750-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2015CF117
2022CM614
2022CF907
2023CF295
2023CF481
2024CF488

**IN COURT OF APPEALS**
**DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

B.M.T.,

   DEFENDANT-APPELLANT.

APPEALS from orders of the circuit court for Manitowoc County: MARK R. ROHRER, Judge. *Affirmed.*

Before Gundrum, Grogan, and Lazar, JJ.

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶1     LAZAR, J.  In these consolidated appeals, B.M.T. seeks review of involuntary medication orders entered in each of six underlying criminal cases. The orders authorized the involuntary administration of psychotropic medication to treat B.M.T.'s schizoaffective disorder with the goal of returning him to competency to face the charges against him, which span more than a decade and involve numerous felonies.

¶2     B.M.T. raises two issues relating to the constitutional sufficiency of the medication orders under *Sell v. United States*, 539 U.S. 166 (2003).  First, B.M.T. argues that the State lacks an important interest in bringing him to trial, because between his six criminal cases, he is charged with only two "serious crime[s]," and because there is a significant "potential" for his future civil commitment pursuant to either WIS. STAT. ch. 51 or the successful assertion of WIS. STAT. § 971.15 (2023-24) defenses based on lack of mental responsibility for his alleged crimes ("NGI").[1]  *Sell*, 539 U.S. at 180.  Second, B.M.T. contends that the medication orders were insufficiently individualized to satisfy the due process demands articulated in *Sell*.  *Id.* at 182.

¶3     We disagree on both counts.  We hold that the totality of the alleged criminal conduct may be considered when determining whether the State has an important interest in bringing a defendant to trial.  Thus, when, as here, circuit courts are presented with alleged "serious crime[s]" coupled with other allegedly felonious conduct, an examination of the totality of the alleged criminal conduct is

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

2

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

in keeping with *Sell*'s directive to "consider the facts of the individual case in evaluating the [g]overnment's interest in prosecution." *Id.* at 180.

¶4    We also hold that, under these facts, the possibility of a future WIS. STAT. ch. 51 commitment or commitments under multiple NGI verdicts do not constitute special circumstances that diminish the State's interest in bringing B.M.T. to trial. A ch. 51 commitment is an uncertain and speculative alternative where, as has been the case throughout much of B.M.T.'s recent past, there is a substantial possibility of outpatient treatment and a history of alleged criminal violations during prior commitments. Also, given the multiple criminal cases spanning nearly a decade, one or more NGI commitments pursuant to WIS. STAT. § 971.17 are also too speculative and uncertain to constitute special circumstances that diminish the State's interest in prosecution.

¶5    Finally, we conclude that the treatment plan approved by the circuit court was sufficiently individualized to satisfy *Sell*'s due process demands. The totality of the evidence demonstrates that the treatment plan was prepared after evaluating B.M.T.'s individual needs and medical history. As we explain in detail below, the treatment orders were based on a medically informed record. We therefore affirm the involuntary medication orders.

## BACKGROUND

¶6    B.M.T. was first diagnosed with schizoaffective disorder in 1995 and has been hospitalized numerous times, including nine hospitalizations at Winnebago County Mental Health Institute starting in 2001. He previously underwent restoration-to-competency treatment in 2006, 2013, and 2014. In 2013

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

and 2014, B.M.T. was restored to competency in an inpatient setting after involuntary medications were ordered.

¶7    B.M.T. resided at the Trempleau County Health Care Center between 2015 and 2019. He has been committed several times under WIS. STAT. ch. 51 and received outpatient services between 2019 and 2023. B.M.T.'s most recent civil commitment ended in March 2024, at which time B.M.T. stopped participating in psychiatric care and became homeless.

¶8    Over the past decade, B.M.T. has been charged with twenty offenses across six different criminal cases. Nine of those charges are felonies. The oldest of these cases is from 2015, when B.M.T. was charged with battery by a prisoner, disorderly conduct, and two counts of misdemeanor bail jumping based upon allegations that he had head-butted a corrections officer and had threatened violence during the altercation.

¶9    After being in institutional care for several years, B.M.T. in 2022 was charged with misdemeanor battery and disorderly conduct, each as an act of domestic abuse. The criminal complaint alleged that B.M.T. became agitated for an unknown reason while in the back seat of a car and pulled his sister's hair and threatened to strike her with his cell phone. When B.M.T. was later taken into custody in connection with that incident, he was allegedly found to have methamphetamine and drug paraphernalia in his possession. He was charged in a separate case with those offenses, a felony and a misdemeanor, respectively.

¶10    In April 2023, B.M.T. was alleged to have initiated a physical altercation after a roommate asked him to turn off a light. He allegedly spit at the

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

victim and then punched her in the face, necessitating stitches. B.M.T. was charged with substantial battery and disorderly conduct as acts of domestic abuse, as well as felony and misdemeanor bail jumping.

¶11 In June 2023, B.M.T. was cited for multiple instances of trespassing when he stood outside a gas station on several different days asking customers to buy him cigarettes or give him money. Ultimately, his alleged refusal to cease this activity garnered a disorderly conduct charge, as well as two additional charges of felony bail jumping and a single count of misdemeanor bail jumping. B.M.T. was ordered not to have any further contact with the gas station, but he allegedly did so again in July 2024, which led to an additional four bail-jumping charges, three of which were felonies.

¶12 B.M.T. was appointed counsel and his competency was questioned. Following an evidentiary hearing, B.M.T. was found not competent to assist in his own defense, and in December 2024, he was committed to the custody and care of the Department of Health Services ("DHS") until such time as he could regain competency. B.M.T. did not appear for a competency review hearing in April 2025 and was taken into custody on a bench warrant. He was admitted to the Mendota Mental Health Institute for competency treatment on May 22, 2025.

¶13 DHS filed a competency report the next month foreshadowing a request for an involuntary medication order. The report noted B.M.T.'s lack of insight into his mental health diagnoses and his consistent refusal of all medications when not under circuit court order. Upon his admission to Mendota, B.M.T. informed clinical staff he did not plan on taking medications. The report

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

noted several instances of erratic behavior, including B.M.T.'s statements to staff that he had undergone physical changes, like growing new tendons in his wrist, since being admitted to Mendota. A few days later, Dr. Kevin Murtaugh, a psychiatrist at Mendota, formally moved for an involuntary medication order to treat B.M.T. to competency. *See* WIS. STAT. § 971.14(5)(am).

¶14 Murtaugh wrote in his treatment plan that B.M.T. displayed "clear signs of psychotic illness" since his admission to Mendota. Murtaugh explained that B.M.T. was unlikely to become competent to stand trial without medication, as "[a]ntipsychotic medication is the only evidence-based treatment for schizoaffective disorder." B.M.T. had refused to engage in any discussion when Murtaugh attempted to explain the advantages, disadvantages, and alternatives of a prescribed oral dose of aripiprazole (Abilify). B.M.T. did not ask any questions or express any specific concerns about the medication; rather, he stated he would not take any medications.

¶15 In terms of the medications requested, Murtaugh noted that B.M.T. had "previously responded fairly well to long-acting injectable haloperidol," but that B.M.T. had "said he did not like how it made him feel." Murtaugh's report also discussed B.M.T.'s prior treatment with another medication, paliperidone. Paliperidone had been administered in the long-acting injectable form, but Murtaugh wrote that it was unclear from the records whether B.M.T. had taken it long enough to adequately treat his symptoms. Murtaugh noted that B.M.T. believed "paliperidone was less 'harsh on [his] system' than haloperidol."

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶16    Murtaugh ultimately recommended a long-acting, 400 mg-per-month Abilify injection in combination with a 30 mg daily oral dose of Abilify for the first two or three months of treatment.  If B.M.T. refused the oral Abilify, Murtaugh proposed to administer 5-10 mg of olanzapine daily in combination with the long-acting Abilify injection.  Murtaugh testified that it was likely Abilify would render B.M.T. competent to stand trial.

¶17    Although Murtaugh provided his opinions to a reasonable degree of medical certainty, he added that he could not guarantee the medication would result in restoration to competency.  He noted that Abilify was a new medication for B.M.T., and it was impossible for him to predict the degree of improvement in any specific patient.  However, he explained that he chose Abilify because haloperidol, while a "helpful medication" for B.M.T. in terms of reducing his symptoms, caused him not to feel well.  Abilify, according to Murtaugh, was a newer, better medication than haloperidol, and well-tolerated by most patients.  Murtaugh "wanted to give [B.M.T.] an opportunity to take something that I thought might work well for him and be likely to cause fewer side effects."

¶18    Murtaugh stated he had no reason to expect adverse reactions to the medication.  He testified B.M.T. was a "generally … healthy man," and he was not aware of any other medications or underlying medical conditions that would preclude the use of any specific psychiatric medication.  Murtaugh also offered that there were no medical concerns or physical characteristics that would necessitate dose adjustment.  He did not have reason to believe B.M.T. would suffer any side effects from the medication, but he noted that such things could be difficult to predict given the nature of psychiatric medications.  To the extent

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

B.M.T. suffered any adverse effects, Murtaugh stated his treatment providers would either stop the medication or address the symptoms B.M.T. was experiencing.

¶19    Based upon Murtaugh's report and testimony, the circuit court ordered the involuntary administration of psychotropic medication. The court found that B.M.T. was "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives." *See* WIS. STAT. § 971.14(3)(dm), (4)(b).

¶20    The circuit court then determined the involuntary administration of medication was consistent with *Sell*'s due process protections. First, the court identified an important governmental interest, namely bringing B.M.T. to trial on the numerous felony counts. Second, the court concluded that the involuntary administration of medication would significantly further that interest given the uncontroverted testimony that the medication would assist in restoring B.M.T. to competency. Third, the court found that there were no less intrusive treatments that were likely "to achieve substantially the same result." Fourth and finally, the court found that the proposed treatment plan was medically appropriate and in B.M.T.'s best interest in light of his medical condition. On that point, the court determined Murtaugh's proposed treatment plan was sufficiently individualized, in that it was based on a review of B.M.T.'s medical history, medical conditions, and risk factors or side effects, and it specified the medications, dosages, and frequency of administration.

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶21    B.M.T. filed a notice of intent to pursue postconviction or appellate relief, triggering an automatic 14-day stay of the medication order pursuant to WIS. STAT. RULE 809.109(7)(a).  B.M.T. moved to continue the stay.  This court denied the motion by order dated August 5, 2025.  These appeals were then consolidated for purposes of briefing and disposition.

## DISCUSSION

¶22    The Due Process Clause of the Fourteenth Amendment protects a defendant's "significant liberty interest" in "avoiding the unwanted administration of antipsychotic drugs[.]" *Johnson v. Tinwalla*, 855 F.3d 747, 748 (7th Cir. 2017) (quoting *Washington v. Harper*, 494 U.S. 210, 229 (1990)).  Consistent with this protection, the government is constitutionally permitted to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges "if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Sell*, 539 U.S. at 179.

¶23    Under this standard, the State must demonstrate, by clear and convincing evidence, that: (1) the State has an important interest in proceeding to trial;  (2) involuntary medication will significantly further that interest; (3) involuntary medication is necessary to further that interest; and (4) involuntary medication is medically appropriate. *Id.* at 180-81; *see also* *State v. Green*, 2021 WI App 18, ¶16, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30,

9

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

401 Wis. 2d 542, 973 N.W.2d 770. The involuntary administration of medication is permissible only if each factor is satisfied. *Green*, 396 Wis. 2d 658, ¶16.

¶24 B.M.T. challenges, under *Sell*, two aspects of his involuntary medication orders. First, B.M.T. concedes that he has been charged with two "serious crimes," but he argues that the remainder of the charges against him are unimportant for *Sell* purposes and that special circumstances—the possibility of future commitments under WIS. STAT. §§ 51.20 or 971.17—lessen the State's interest in prosecuting him, thereby depriving the government of an important interest under the first *Sell* factor.

¶25 Second, B.M.T. argues that the involuntary medication orders are insufficiently individualized and therefore violate his due process rights under *Sell*. He argues that the orders are akin to the "general" treatment plans invalidated in *Green*, 396 Wis. 2d 658, ¶34. B.M.T. reasons that his treatment orders are not premised on a sufficient assessment of B.M.T.'s medical condition or information, including potential side effects. *See id.*, ¶42.

¶26 Before turning to B.M.T.'s two due process arguments, we pause to address the applicable standard of review to apply in analyzing the *Sell* factors. B.M.T. argues courts should review a *Sell* determination as a matter of constitutional fact. Such a review requires a two-tier approach, under which questions of historical fact are resolved by applying the clearly erroneous standard, while the determination of whether those facts meet the legal standard is reviewed de novo. *See State v. Post*, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634. The

10

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

State argues the standard of review is irrelevant, because the "State prevails under either a de novo or clearly erroneous standard for all *Sell* factors."

I.  *We need not settle the existing uncertainty regarding the standard of review applicable to the **Sell** analysis because the State has satisfied its burden even applying the most favorable standard of review to B.M.T.*

¶27  Wisconsin law is not settled on the standard of review to apply in an appeal involving a *Sell* determination.  *See State v. D.E.C.*, 2025 WI App 9, ¶35, 415 Wis. 2d 161, 17 N.W.3d 67 (2024), *review denied*, 2025 WI 16, 23 N.W.3d 216.  Three cases—*Green*, 396 Wis. 2d 658, ¶20; *State v. J.D.B.*, 2024 WI App 61, ¶34, 414 Wis. 2d 108, 13 N.W.3d 525, *review granted*, 2025 WI 8, 18 N.W.3d 694; and *D.E.C.*, 415 Wis. 2d 161, ¶35—have declined to decide the applicable standard of review because each concluded the result would have been the same regardless of which standard of review applied.  We take the same approach here.[2]

II. *Special circumstances attendant to B.M.T.'s cases do not diminish the State's important interest in bringing B.M.T. to trial.*

¶28  *Sell* recognized the importance of the government's interest in bringing to trial an individual accused of a serious crime—regardless of whether that crime was against a person or against property.  *Sell*, 539 U.S. at 180.  Indeed, the prosecution of serious crimes effectuates "the basic human need for security[,]" *id.*, and as such the government's power to bring an accused to trial is "fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and

---

[2] We note that the applicable standard of review may be resolved by our supreme court as part of the pending proceedings in *State v. J.D.B.*, 2024 WI App 61, 414 Wis. 2d 108, 13 N.W.3d 525, *review granted*, 2025 WI 8, 18 N.W.3d 694.  Oral argument in that case was held on September 8, 2025.

11

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

peace," ***Riggins v. Nevada***, 504 U.S. 127, 135-36 (1992) (quoting ***Illinois v. Allen***, 397 U.S. 337, 347 (1970) (Brennan, J., concurring)).

¶29    As a threshold matter, B.M.T. acknowledges that he has been charged with two serious crimes: battery by a prisoner in 2015 and substantial battery as an act of domestic abuse in 2023.  The former is a Class H felony, WIS. STAT. § 940.20(1) (2015-16); the latter is a Class I felony, WIS. STAT. § 940.60(2). We agree with B.M.T.'s concession: these two offenses undoubtedly constitute serious crimes that B.M.T. is alleged to have committed.  *See **J.D.B.***, 414 Wis. 2d 108, ¶36 (holding that battery to a law enforcement officer is a "serious crime" under ***Sell***).

¶30    B.M.T. argues none of his other 18 charges are "serious" in the context of the first ***Sell*** factor.  In so arguing, B.M.T. directs us to more than a dozen Wisconsin statutes that declare particular offenses to be "serious" for one purpose or another.  As justification for this focus on legislative declaration, B.M.T. appears to rely on ***J.D.B.***, which noted that federal circuit courts had not reached a uniform method for determining whether a crime was "serious" under ***Sell***.  ***J.D.B.***, 414 Wis. 2d 108, ¶36.  Therefore, the ***J.D.B.*** court looked to some state statutes using that term (including WIS. STAT. § 969.08), as well as the potential penalties for the alleged crime.  *See **J.D.B.***, 414 Wis. 2d 108, ¶36.  These matters, together with the violent nature of the offense, convinced the ***J.D.B.*** court that battery to a law enforcement officer was a serious crime.  ***Id.***

¶31    The State takes issue with B.M.T.'s approach to the question of whether he is charged with serious crimes.  In the State's view, that determination

12

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

"does not turn on a canvassing of unrelated statutes."[3]    Instead, the State emphasizes that under *Sell* we are to "consider the facts of the individual case in evaluating the [g]overnment's interest in prosecution." *Sell*, 539 U.S. at 180.  And so, the State argues that "being charged with 'a serious crime' is sufficient, but not necessary, to satisfy the first *Sell* factor, the ultimate touchstone of which is the importance of the government's interest in prosecution."  Accordingly, the State proposes that when a defendant has been charged with a serious crime, the inquiry ends, and we need not consider whether there are other special circumstances that diminish the State's interest in prosecution.

¶32    It is not necessary for us to adopt the State's categorical rule to conclude that the first *Sell* factor is satisfied here.  B.M.T.'s concession, coupled with other aspects of the various criminal cases, lead to the inescapable conclusion that the State has an important—perhaps even compelling—interest in bringing B.M.T. to trial.

¶33    The nature of the criminal charges and B.M.T.'s significant criminal exposure weigh heavily in this analysis.  As B.M.T. concedes, the two felony battery charges are serious matters.  The alleged violence permeating B.M.T.'s criminal history is particularly concerning.

---

[3] In a footnote, B.M.T. observes that substantial battery is not identified as a serious crime under WIS. STAT. § 969.08(10)(b), which pertains to the revocation of pretrial conditions of release, though substantial battery is defined as such for some other reporting purposes. *See* WIS. STAT. §§ 48.685(1)(c); 50.065(1)(e).  So, despite conceding that substantial battery is a serious crime for *Sell* purposes, B.M.T. seems somewhat unpersuaded by his own statutory declaration arguments.  At a minimum, B.M.T. seems to acknowledge that a "serious crime" under *Sell* cannot depend on the definition adopted by any one existing statute.

13

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶34 More generally, the collective twenty charges, nine of which are felonies, reflect an individual who is allegedly incapable or unwilling to conform his conduct to the requirements of the law. Although the many bail-jumping charges are not serious in isolation, the sheer volume of such charges over nearly a decade speak to the State's interest in resolving these various criminal matters. As the State notes, the existing charges expose B.M.T. to a total of more than 50 years' imprisonment.

¶35 One of the cases on which B.M.T. relies, *United States v. White*, 620 F.3d 401 (4th Cir. 2010), endorses this collective approach. There, the defendant was charged with entirely nonviolent crimes, consisting of six total counts for conspiracy to commit credit card fraud, credit card fraud, and aggravated identity theft. *Id.* at 405. Collectively, the crimes were punishable with up to 37 years' imprisonment. *Id.* at 411. Applying Fourth Circuit precedent, the court concluded that because the defendant was facing more than ten years' criminal exposure, she had been charged with "serious" crimes for purposes of *Sell*. *White*, 620 F.3d at 411 (citing *United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005)).

¶36 *Sell*, *White*, and *J.D.B.* collectively counsel that the extent of the defendant's criminal exposure—in nature, scope, and penalty—informs the government's interest in bringing the defendant to trial. Here, the State's interest extends not merely to the two conceded "serious crimes" of battery, but to the whole panoply of alleged criminal conduct. We therefore accept B.M.T.'s concession that, as a general matter, the State has demonstrated an important interest in bringing B.M.T. to trial.

14

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶37     B.M.T. argues there are special circumstances attendant to his cases that diminish the State's interest in bringing him to trial.  B.M.T. correctly notes that, contrary to the State's assertion, it is not sufficient under the first *Sell* factor that the State generally has an important interest in bringing anyone to trial who is charged with a serious crime.  *See **J.D.B.***, 414 Wis. 2d 108, ¶37.  "The inquiry is whether, *under the particular circumstances of each individual case*, the State has an important interest in bringing *that defendant* to trial on that serious charge."  ***Id.*** (first emphasis added).

¶38     In this respect, B.M.T. asserts that there are two related special circumstances that diminish the State's interest in prosecution.  Seizing on *Sell*'s observation that "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution[,]" ***Sell***, 539 U.S. at 180, B.M.T. argues that there is a significant potential he will be confined through mechanisms other than a criminal prosecution.  Specifically, B.M.T. claims there is a significant potential of another WIS. STAT. ch. 51 commitment or of his future successful assertion of WIS. STAT. § 971.15 NGI defenses.[4]  Neither of these

---

[4] The "significant potential" of these two mechanisms—a WIS. STAT. ch. 51 civil commitment or a defense asserting lack of responsibility by reason of mental disease or defect— have been identified by our court as undercutting the State's interest in bringing a defendant to trial.  *See **J.D.B.***, 414 Wis. 2d 108, ¶41.  However, as the State notes, a defendant who is incompetent to stand trial cannot reach the guilt phase of an NGI proceeding, because such a defendant cannot enter a guilty plea or be tried criminally.  *See* WIS. STAT. § 971.13(1).

(continued)

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

mechanisms, however, diminish the State's important interest in bringing B.M.T. to trial in this instance.

¶39   Turning first to the potential for a future WIS. STAT. ch. 51 commitment, we conclude such a possibility does not cast doubt on the government's interest in moving toward trial on B.M.T.'s pending cases. Prior ch. 51 commitments have been ineffective at preventing additional alleged criminal conduct, and B.M.T. provides no reason to believe a future commitment will accomplish what previous commitments could not.

¶40   On that point, the State notes that WIS. STAT. ch. 51 commitments are designed to be of short duration. The initial commitment lasts no more than six months, with subsequent consecutive orders of commitment limited to no more than a year. *See* WIS. STAT. § 51.20(13)(g)1. Also, B.M.T. does not dispute the State's assertion that some portion of a future commitment might be on an outpatient basis, consistent with B.M.T.'s most recent experience. Civil commitment as an outpatient is not the type of civil confinement that *Sell* contemplated would diminish the government's interest in prosecution. *See United States v. Dillon*, 738 F.3d 284, 294-95 (D.C. Cir. 2013).

---

Based on the briefing and oral argument in *J.D.B.*, how to determine whether an alleged crime is "serious" for *Sell* purposes, and what "special circumstances" might diminish the government's interest in prosecution, appear to be issues that are presently before our supreme court. For the time being, however, we are obligated to follow existing precedent, *see Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997), and given the short statutory decision period in this case, *see* WIS. STAT. RULE 809.109(5)(d), we do not think it prudent to hold the case pending our supreme court's decision in *J.D.B.*—nor has any party asked us to do so.

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶41　We are unpersuaded that *J.D.B.* counsels otherwise. There, the defendant's competency proceedings were converted to a civil commitment under WIS. STAT. ch. 51. *J.D.B.*, 414 Wis. 2d 108, ¶21. The court observed that there was a "significant potential" for the defendant's future civil commitment, in part because the mental health crisis precipitating the alleged offense was being addressed through the ongoing ch. 51 proceedings. *Id.*, ¶41. Not so here, where the possibility of further civil commitment for B.M.T. remains "uncertain and speculative," *see id.*, ¶40, and previous commitments have been ineffective at addressing B.M.T.'s alleged criminality.

¶42　Also unlike in *J.D.B.*, the Record here does not demonstrate a possibility of a future acquittal for B.M.T. based on the successful assertion of an NGI defense. An NGI acquittal results in, for felony offenses, a period of commitment to the DHS not to exceed the maximum term of confinement that could be imposed for the crimes. *See* WIS. STAT. § 971.17(1)(b). We cannot deem the possibility of such a commitment anything other than "uncertain and speculative," given that B.M.T.'s alleged crimes encompass a wide variety of criminal activity occurring for nearly a decade. The *J.D.B.* court did not need to grapple with our scenario here; that case involved a single offense that occurred on the same day as the defendant was seen by health professionals for "homicidal thoughts." *J.D.B.*, 414 Wis. 2d 108, ¶41.

¶43　The State also argues that reversing the involuntary medication orders in this case would violate the victims' constitutional rights under WIS. CONST. art. I, § 9m(2). Because we conclude on other grounds that the State adequately satisfied its burden of demonstrating an important interest in bringing

17

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

B.M.T. to trial, we do not decide this issue. *See **State ex rel. Oitzinger v. City of Marinette***, 2025 WI App 19, ¶76, 415 Wis. 2d 635, 19 N.W.3d 663 (observing the court of appeals decides cases on the narrowest possible grounds).

III. *The involuntary medication order does not violate B.M.T.'s due process rights because his treatment plan was sufficiently individualized under the second and fourth **Sell** factors.*

¶44    The second, third, and fourth *Sell* factors collectively concern the efficacy of involuntary medication in relation to the State's interest in prosecution, as well as the medical appropriateness of the medication. Together, these factors require the State to put forth an individualized treatment plan that

> "[a]t a minimum," identifies "(1) the specific medication or range of medications that the [defendant's] treating physicians are permitted to use …, (2) the maximum dosages [of those medications] that may be administered, and (3) the duration of time that involuntary treatment … may continue before the treating physicians are required to report back to the court …."

*Green*, 396 Wis. 2d 658, ¶38 (citations omitted).

¶45    B.M.T. argues his treatment plan was "insufficiently particularized" under the second and fourth *Sell* factors. On the second factor, B.M.T. contends the State failed to demonstrate that treatment with Abilify and olanzapine is "substantially likely" to restore him to competency and "substantially unlikely" to have side effects that interfere with his defense. *See **Green***, 396 Wis. 2d 658, ¶¶38-39. On the fourth factor, B.M.T. argues the treatment plan is insufficiently individualized to prove that involuntary medication with Abilify and olanzapine was "medically appropriate" for him. *See **id.***, ¶40.

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

¶46    In these respects, B.M.T. argues the treatment plan here fails for much the same reason as the treatment plan in *Green*. *Green* observed that

> [t]he defendant's age and weight, the duration of his or her illness, his or her past responses to psychotropic medications, his or her cognitive abilities, other medications he or she takes, and his or her medical record may all influence whether [the administration of] a particular drug given at a particular dosage … is "substantially likely"

to restore the defendant to competency. *Id.*, ¶38.    Such individualized considerations prevent the State from "simply offer[ing] a generic treatment plan with a medication and dosage that are generally effective for a defendant's condition." *Id.*, ¶34.

¶47    The treatment plan authorized by the circuit court is not a generic treatment plan lacking any nexus to B.M.T.  When preparing the treatment plan, Murtaugh reviewed B.M.T.'s records from the current Mendota admission; Winnebago County Mental Health Institute records from 2023, 2021, and 2020; and competency evaluations by three different psychologists in 2024 and 2025. Murtaugh specifically identified two drugs triggering adverse drug reactions in B.M.T.; neither was proposed as medication for his treatment.

¶48    The Record belies B.M.T.'s assertion that Murtaugh selected Abilify and olanzapine for treatment without any regard for B.M.T.'s individual characteristics.  Murtaugh's report and testimony demonstrate that he carefully considered B.M.T.'s past experience with antipsychotic medications haloperidol and paliperidone. *See D.E.C.*, 415 Wis. 2d 161, ¶45 ("When someone has such a history, treatment providers may have a head start in zeroing in on one or more

19

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

antipsychotics (and perhaps also zeroing in on specific dosages) that might be effective for a patient and not cause significant side effects.").

¶49    In fact, Murtaugh specifically selected Abilify for treatment because B.M.T. reported that he did not like how haloperidol made him feel, and B.M.T.'s records failed to establish that paliperidone had been administered for a sufficient time to gauge B.M.T.'s response to that medication.  As for the method of administering medication, the treatment plan expressed a preference for a long-acting injectable given B.M.T.'s poor history of medication compliance. Further, the plan states that the proposed medications were in appropriate dosages given B.M.T.'s medical history and individual physical characteristics like height and weight.

¶50    B.M.T. argues that the Record is incomplete regarding Murtaugh's choice of olanzapine as a fallback medication.  It is true that there was little testimony about the selection of olanzapine specifically.  But, as set forth above, that does not make the treatment plan a general one, devoid of any consideration of B.M.T.'s individual characteristics.  Murtaugh's selection of olanzapine to accompany the long-acting Abilify injection was presumably informed by the same health and treatment history considerations that informed the selection of Abilify.  Certainly, Murtaugh's observation that B.M.T. had no underlying medical conditions or prescriptions that would preclude the use of any specific medication applies equally to Abilify and olanzapine.

¶51    We are unpersuaded that under these facts, more detailed information about olanzapine was necessary for the State to meet its burden.  The

20

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

State's obligation is to show a "'substantial likelihood' that the plan will result in successful treatment based on 'evidence specific to the individual,' which does not require a listing of each and every medical consideration or procedure that a testifying psychiatrist may testify about." ***D.E.C.***, 415 Wis. 2d 161, ¶51 (quoting ***Green***, 396 Wis. 2d 658, ¶33). Here, the first-order medication Abilify was, naturally, the main focus of the testimony, as that was the only drug that would be administered with certainty.

¶52 On this point, we also note the lack of defense questioning on the selection of olanzapine, among other things. It is true that, as B.M.T. emphasizes, the State bears the burden of proving "by clear and convincing evidence that involuntary medication was 'substantially likely to render the defendant competent to stand trial' and 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense[.]'" ***Green***, 396 Wis. 2d 658, ¶37 (quoting ***Sell***, 539 U.S. at 181).

¶53 The allocation of that burden on the State does not, however, absolve the defendant from creating an evidentiary record that supports an appellate challenge. In ***D.E.C.***, for example, the court observed that the defendant "did not provide the circuit court with a good reason to question whether the treatment plan would be safely administered[,]" 415 Wis. 2d 161, ¶47, nor did defense counsel ask "about whether administration of more than one medication at [a] time was contemplated," *id.*, ¶53.

¶54 Here, as the State observes, B.M.T.'s decision not to question Murtaugh about olanzapine "exposed [him] to the risk that the circuit court would

21

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

accept the uncontested representations in the individualized treatment plan." Quoting *D.E.C.*, the State continues, "[i]f there was anything in the additional medications that appeared inappropriate to defense counsel, [Murtaugh] was available to testify on that topic." *Id.*, ¶76.

¶55    B.M.T. also highlights Murtaugh's testimony that he could not be certain of restoration to competency even following treatment with the proposed medications, and that he was uncertain precisely how B.M.T. might react to Abilify. But "the *Sell* standard does not require certainty." *Green*, 396 Wis. 2d 658, ¶33. *Sell* tolerates some trial-and-error on the part of treating physicians when a defendant has no experience with a prescribed antipsychotic, both in terms of assurances of effectiveness and in terms of addressing side effects. *See D.E.C.*, 415 Wis. 2d 161, ¶45. It is not fatal to the treatment plan here that Murtaugh could not guarantee Abilify's effectiveness or predict with perfect accuracy whether B.M.T. would suffer any side effects.

¶56    *D.E.C.* confirms that we look to the totality of the evidence before the circuit court to determine whether the treatment order was based on a "medically informed record." *Id.*, ¶75; *see also Green*, 396 Wis. 2d 658, ¶2. The treatment plans in *Green* and *J.D.B.* failed in this regard, but in those cases—unlike here—the physician had done little to tailor the plans to the individual defendant.

¶57    In *Green*, for example, the testifying physician did no more than offer an opinion regarding the efficacy of the proposed medication in individuals with the same psychotic disorder; he had not reviewed Green's medical records,

22

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

he was not involved in prescribing medication for Green, and no prescription could be ordered without further face-to-face evaluation and identification of any comorbidities. *Green*, 396 Wis. 2d 658, ¶¶21-22, 32.

¶58 Despite the physician in *J.D.B.* having conducted in-person evaluations, the resulting treatment plan was defective for reasons that do not apply to B.M.T. The plan in that case did not specify medication frequency or sequencing, nor was there any evidence the dose ranges were individualized to the defendant. *J.D.B.*, 414 Wis. 2d 108, ¶¶56, 58-59. The plan merely contained an unordered list of seven possible medications. *Id.*, ¶58. Additionally, parts of the treatment plan were plainly false. Whereas the plan reported that the defendant had no physical health conditions, in fact he had diabetes and had been prescribed medication to prevent seizures. *Id.*, ¶60.

¶59 Based on the foregoing, we conclude that the State satisfied its burden of proof under *Sell*. The treatment plan approved by the circuit court is sufficiently individualized to satisfy due process demands.

## CONCLUSION

¶60 Pursuant to *Sell*, when determining whether to authorize the involuntary administration of psychotropic medication to restore an incompetent defendant to competency, the circuit court may consider the totality of the alleged criminal conduct to assess whether the State has an important interest in bringing a defendant to trial. When, as here, there are "serious crimes" coupled with other allegedly felonious conduct, a court need not ignore the defendant's total criminal exposure when assessing whether there are special circumstances that otherwise

Nos. 2025AP1745-CR
2025AP1746-CR
2025AP1747-CR
2025AP1748-CR
2025AP1749-CR
2025AP1750-CR

diminish the State's interest. Here, the possibility of a future WIS. STAT. ch. 51 commitment order or commitment pursuant to one or more NGI verdicts does not override the State's weighty interest in prosecuting B.M.T.

¶61 Finally, the treatment plan approved by the circuit court to restore B.M.T. to competency was sufficiently individualized to satisfy *Sell*'s due process demands because it was based on a medically informed record. The treatment plan was tailored to B.M.T.'s physical characteristics and mental disorder, and it took into account his past experience with psychotropic medication and the possibility of any adverse side effects. Accordingly, we affirm the orders of the circuit court.

*By the Court.*—Orders affirmed.

Recommended for publication in the official reports.